[L. A. No. 1948.   In Bank.—July 8, 1908.]

M. F. O'DEA et al., Appellants, v. THE HOLLYWOOD CEMETERY ASSOCIATION (a Corporation), et al., Respondents.

CORPORATIONS—COMPLAINT TO ENJOIN ASSESSMENT—UNEQUAL ASSESSMENT—FULLY PAID STOCK.—Where the complaint in an action by stockholders of a corporation to enjoin the sale of stock owned by them for an alleged invalid delinquent assessment, levied thereon as a call for an unpaid portion of the subscription price thereof, and which was not levied on the other stock in the corporation, is framed on the theory either that the unassessed stock was not issued as fully paid up and stood upon the same plane as to assessments as the assessed stock, or, if the unassessed stock was issued as fully paid up, the stock assessed was equally so, the plaintiffs cannot contend that the evidence showed, and that the trial court should have found, that all the stock in the corporation was issued as fully paid up.

ID.—PLEADING—ESTOPPEL TO DENY STOCK IS FULLY PAID.—There is a very essential distinction between an allegation in a complaint that a corporation by reason of its conduct is estopped from denying

that stock which it has issued was fully paid, and an allegation that stock which it had issued.had been in fact fully paid for before or at the time of its issuance.

ID.—EVIDENCE—FINDINGS.—Upon a review of the evidence it is held to sustain the findings of the court that the stock assessed was issued as subscription stock and had not been fully paid up, and that the stock not assessed was issued as fully paid up and for an adequate consideration.

ID.—RIGHT OF DIRECTORS TO ISSUE FULLY PAID STOCK—INADEQUACY OF CONSIDERATION—ATTACK BY STOCKHOLDERS.—Directors of a corporation have a right to issue stock as fully paid up, upon such terms and at such price as they see fit, and in the absence of fraud, so far as the stockholders or their assigns are concerned, the action of the directors in issuing it is final, and the action of the corporation cannot be attacked by the stockholders, or the validity of the issue assailed on the ground, merely, that the consideration was inadequate for which the corporation issued it as fully paid up. Creditors may attack the transaction, but stockholders cannot.

ID.—STOCK ISSUED FOR PROPERTY TRANSFERRED BY OTHER CORPORATION —DIVISION AMONG STOCKHOLDERS OF TRANSFERRER.—Stockholders in a corporation which issues its fully paid up stock in consideration of the transfer to it of the property of another corporation, cannot question the validity of the stock so issued, merely on the ground that it was issued in pursuance of an agreement whereby it was to be, and was, issued to the president of the transferrer to be distributed to the stockholders of the corporation making the transfer, and to other persons not connected therewith. And this is so, notwithstanding section 309 of the Civil Code prohibits the distribution of the corporate capital, or the property received in exchange for it, among the stockholders.

ID.—DE FACTO DIRECTORS MAY LEVY ASSESSMENT.—Persons regularly elected directors of a corporation and acting as such, although they may not be *de jure* directors by reason of the fact that the stock standing in their name was invalid, are at least *de facto* directors, and have power to levy an assessment; and their right to do so cannot be collaterally questioned or attacked.

ID.—SUBSCRIPTION TO STOCK—EQUALIZATION OF PAYMENTS BY ASSESSMENT.—Under section 332 of the Civil Code, providing that an assessment may be for the full amount unpaid upon the capital stock of a corporation to meet liabilities or to satisfy claims of creditors, it is proper, where part of the stock of a corporation has been fully paid, or partially paid, to levy an assessment for the unpaid portion of the subscription price upon those other shares of the capital stock upon which a less amount or nothing has been paid, in order to equalize the subscription payment on all the stock.

ID.—UNEQUAL ASSESSMENT.—It would not be proper, however, to levy an assessment to call in a given amount on a portion of the unpaid

stock, and a less amount on another, if all the stock stood in the same class as to the unpaid subscription price.

ID.—ASSESSMENT TO COLLECT SUBSCRIPTIONS.—An assessment *is* the proper method to collect unpaid subscriptions to corporate stock.

ID.—CERTIFICATE OF STOCK—ISSUANCE WITHOUT SHOWING AMOUNT PAID —ESTOPPEL OF CORPORATION.—Where certificates of stock in a corporation were issued before the amendment of section 323 of the Civil Code, requiring certificates issued prior to the payment of the full amount due to state the amount paid, without anything on the face of the certificate to indicate the amount paid on the stock, and such certificates are purchased in good faith in the open market, the corporation is not estopped thereby to claim that the stock had not been fully paid, and the purchaser had no right to assume anything as to the payment.

ID.— CERTIFICATES NOT NEGOTIABLE INSTRUMENTS — BONA FIDE PURCHASER.—Certificates of stock are not negotiable securities in the sense that they are subject in the hands of a *bona fide* purchaser to the same rules governing the transfer of negotiable instruments. The stock represented by them is subject to assessment for subscription calls, no matter to whom it may be transferred, and a purchaser takes them subject to all equities in favor of the corporation.

ID.—PURCHASER AT DELINQUENT SALE—LIABILITY FOR ASSESSMENT.— When a corporation offers stock for sale to pay a delinquent assessment it acts as the agent of the delinquent stockholder, and a purchaser at the sale takes the title that the delinquent stockholder had and no other, and he takes it subject to liability for the unpaid subscription price.

APPEAL from a judgment of the Superior Court of Los Angeles County. Frank F. Oster, Judge presiding.

The facts are stated in the opinion of the court.

Walpole Wood, Frank G. Finlayson, and Jesse F. Waterman, for Appellants.

J. S. Chapman, George H. Moore, and Herbert Cutler Brown, for Respondents.

LORIGAN, J.—This action was brought by four stockholders of the defendant corporation against it, and its board of directors, to enjoin the sale by them of 7690 shares of stock of said corporation, owned by plaintiffs, for a delinquent assessment of four dollars a share levied on said stock.

The corporation was organized October 25, 1899, with a capital stock of two hundred thousand dollars, divided into

twenty thousand shares of the par value of ten dollars a share.

All the stock of the corporation was issued. The seven directors of the company subscribed for, and there was issued to them, ten shares each, and the remaining 19,930 shares were issued in two certificates, one certificate numbered 8 being for 7680 shares, and another certificate numbered 9 being for 12,250 shares. Certificate number 8 was issued to F. W. Samuelson individually, and number 9 to F. W. Samuelson, as trustee.

The assessment in question was levied on 7750 shares of the corporate stock, which embraced the 70 shares originally issued to the directors of the corporation, and the 7680 shares issued to Samuelson individually, represented by certificate number 8, and to which particular shares the plaintiffs had succeeded as purchasers. This assessment, levied upon the 7750 shares only, was levied upon the theory that these shares were not fully paid up shares, and was levied as a call for an unpaid portion of the subscription price thereof. No assessment was levied upon the remainder of the shares of the capital stock, being the 12,250 shares issued to Samuelson, as trustee, and represented by certificate number 9, upon the theory that said stock was fully paid up, and not subject to said assessment or call. The assessment on sixty of the shares originally issued to the directors was paid. The other ten shares so issued to the directors were acquired by plaintiffs, and upon these shares and the 7680 acquired by them, and represented by certificate number 8 issued to Samuelson individually, they refused to pay, contending that the assessment was invalid, and it is the validity of such assessment that is involved in this action.

The complaint was framed upon the theories, 1. That the 12,250 shares represented by certificate number 9 were not fully paid up and stood upon the same plane as to assessments as the balance of the stock of the corporation, and that the assessment should have been levied upon them, as well as upon the 7750 shares; and 2. That if the 12,250 shares were fully paid up, the shares held by the plaintiffs were equally so; that they had been purchased by them in good faith and for value, and upon the representation of the corporation that said shares were fully paid up, and the corporation was thereby estopped to deny to these shares the character of fully paid

up stock; and the claim of plaintiffs is, that upon either theory, any assessment levied should have been upon all the shares of stock of the corporation; that a levy upon a portion thereof only was invalid for want of equality.

The findings of the court were against the plaintiffs upon the issues made under these theories. It found that the assessment was valid and entered judgment in favor of the defendants.

This appeal is taken by the plaintiffs from the judgment accompanied by a bill of exceptions bringing up the evidence for review in an attack by them upon the sufficiency of the evidence to sustain the findings.

Before approaching a consideration of the main propositions involved in the attack upon the findings, it may be said that as to the ten shares originally issued to one of the directors of the corporation and held by one of the plaintiffs, there can be no manner of doubt but that the finding of the court that nothing was paid on its subscription price save a ten per cent assessment, is correct.

This brings us to a consideration of the really controlling question on this appeal, which is the correctness of the findings of the court as to the *status* of the stock represented by the certificates numbered 8 and 9 respectively.

It must be conceded, as the respondents freely do, that if the 7680 shares of stock included in the 7750 shares upon which the assessment in question was levied, stood in the same position with reference to the payment, or non-payment of the subscription price thereof, as the 12,250 shares did which were not assessed, such assessment would clearly be void for want of equality in its levy.

The court found that it did not stand in the same position.

As to certificate number 8 for the 7680 shares, the court found that on October 16, 1899, F. W. Samuelson, who was then president of the defendant corporation, caused to be issued to himself the certificate representing such shares; that he caused said certificate to be issued without any authority of the board of directors of the corporation therefor; that nothing whatever was paid upon said certificate at the time of its issuance; and, that nothing has been paid thereon since, with the exception of an assessment of ten per cent levied in March, 1904. The court, however, found that after the issuance of

said certificate, by levying and collecting the assessment of March, 1904, and by other acts and conduct on its part, the corporation recognized and treated the said certificate as having been validly issued to said Samuelson, upon his credit, for the full par value thereof, and is now estopped to assert that said certificate or the said shares are invalid, but is not estopped to deny that anything has been paid thereon in addition to said assessment levied in the month of March aforesaid.

The finding of the court as to the 12,250 shares evidenced by certificate number 9 was that they were fully paid shares of stock of the corporation issued in consideration of property received by it.

The main attack made by appellants here is as to the sufficiency of the evidence to sustain these findings, and a consideration of this attack will necessitate a somewhat extended reference to the transactions surrounding the formation of the defendant corporation and relating to the issuance of these two certificates 8 and 9. Upon these matters the evidence in the case shows that F. W. Samuelson and one Lombard were in 1897 the owners of a sixty-acre tract of land near Hollywood in Los Angeles County, and in that year, they, with others, formed a corporation known as the Hollywood Cemetery Association for the purpose of establishing a cemetery upon said tract of land. Subsequent to the formation of this corporation (which shall hereafter be referred to as the old corporation), and when it was about to actively engage in opening up and conducting the cemetery on this land, opposition developed and its operations were stopped by an injunction issued in the superior court of Los Angeles County. After the injunction was granted an appeal was taken by the corporation to this court. While the appeal was pending the defendants H. C. Brown, N. M. Entler, and John Freeman, who had no connection whatever with this corporation, conceived the idea of starting a cemetery in Los Angeles County, and with that object in view procured options upon a tract of land located about a mile and a half from the cemetery of the old corporation. Before anything else was done by them in furtherance of their project, this court reversed the judgment of the superior court enjoining the Hollywood Cemetery Association from establishing its cemetery. (*County of Los Angeles* v. *Hollywood Cemetery Association*, 124 Cal. 344,

[71 Am. St. Rep. 75, 57 Pac. 153].)   After such reversal and in order to avoid the establishment of two competing cemeteries in close proximity to each other, Brown and his associates entered into communication with Samuelson, who with Lombard, was the principal owner of the old corporation, with the view to combining the two enterprises.   An understanding was reached between them which, however, was not reduced to writing, and as to it, Brown testified that it was agreed that a new corporation was to be organized, and of the stock thereof, he and his associates were to receive forty-five per cent and fifty-five per cent thereof was to go to Samuelson and those associated with him in the old corporation.   The consideration for the issuance of forty-five per cent of the stock to Brown, Entler, and Freeman was their withdrawal and abandonment of their proposed enterprise, and "throwing their energies, as far as they amounted to anything, in the direction of building up the other cemetery proposition."   Thereafter the Hollywood Cemetery Association, defendant in this case (hereafter to be referred to as the new corporation), was formed.   The signers of the articles of incorporation were Samuelson, Brown, Entler, Freeman, and three others, each of whom subscribed for ten shares of stock.   Upon the trial the corporate records, consisting of the minute-book and stock and transfer books, were offered in evidence, and the minutes disclosed that the first meeting of the board of directors of the new corporation was held on September 14, 1899.   At this meeting Samuelson was elected president and Freeman secretary of the corporation.   Another meeting was held on October 17, 1899, at which Samuelson, Entler, Freeman, and Brown were present and at which it was decided that the corporation should purchase from the Hollywood Cemetery Association, the old corporation, the lands and premises owned by it in Los Angeles County "upon some such terms as was outlined by Mr. Samuelson, and to that end that a bonded indebtedness be created."   At a meeting of the directors held on October 24, 1899, a meeting of the stockholders was called to be held on October 25, 1899, for the purpose of considering the creation of a bonded indebtedness of the corporation to the amount of sixty thousand dollars.   Pursuant to this call a stockholders' meeting was held.   It is shown by the minutes that at this meeting there were repre-

sented 7750 shares of the stock, 7690 shares thereof being entered as held by F. W. Samuelson and ten shares by each of the other six directors, this being all the stock at that time issued. An adjournment of this meeting was had, at which a resolution was adopted authorizing the creation of a bonded indebtedness in the amount of sixty thousand dollars, to be evidenced by three hundred bonds of the denomination of two hundred dollars each, secured by a mortgage or deed of trust of all the lands then owned, or thereafter to be acquired by the corporation. This resolution, according to the minutes, was adopted by a vote of the stockholders holding the 7750 shares. A meeting of the board of directors was held upon the same day, at which a resolution was adopted creating a bonded indebtedness as authorized by the stockholders. Upon October 27, 1899, another meeting of the board of directors was held, at which a resolution providing for the acquisition of the property of the old corporation was adopted. This resolution recited an offer by the old corporation to sell to the new one the sixty acres of land owned by it for forty thousand dollars of the bonds of the new corporation at par and 12,250 shares of the capital stock of the new corporation, issued fully paid up at the par value thereof, said shares to be turned over to the stockholders of the old corporation in proportion to their respective holdings. It further recited the agreement of the stockholders of the old corporation to turn over to the new one all of their shares of stock in the old corporation. The resolution declared that the corporation should purchase the property upon these terms and conditions, and that the president and secretary be authorized to deliver to the Hollywood Cemetery Association (the old corporation) upon receipt of a good and sufficient deed conveying the property, and the assignment by the stockholders of all of their shares of stock in the old corporation, the bonds of the new corporation in the sum of forty thousand dollars, and to issue and deliver to Samuelson, as trustee, for the purposes aforesaid, the said 12,250 shares of the capital stock of the corporation fully paid, and at the par value thereof. Samuelson, though present, refrained from voting upon this resolution, but all of the other directors present voted in favor of it, and it was subsequently consented to in writing by the one director who had been absent from the meeting when it was adopted.

A meeting of the board of directors was again held on January 18, 1900. at which time a resolution was adopted, which, after reciting the purchase of the property of the old corporation, the issuing of the forty thousand dollars in bonds to that corporation, the conveyance by the latter of the property, and the assignment by the stockholders of their stock, ratified the issuance of the 12,250 shares of the capital stock of the new corporation as theretofore authorized. As to the subsequent history of these 12,250 shares represented by certificate number 9, which, as heretofore stated, was issued to F. W. Samuelson, as trustee, it appears that Samuelson indorsed and surrendered this certificate and received in exchange a certificate for 9390 shares in his own name and certificates for 2860 shares in the names of the other stockholders of the old corporation, which later he delivered to them. The 9390 shares he at once transferred to Brown, Entler, and Freeman, they each receiving 3130 shares. Upon the trial it was stipulated between the parties that Samuelson took the 12,250 shares "for the very purpose of splitting the same up as aforesaid and for the purpose of turning over to each of the said three persons, viz.: H. C. Brown, Entler and Freeman said 3130 shares, in accordance with the pre-existing understanding, that according to said understanding it was not necessary for either of the three persons, viz.: H. C. Brown, Entler and Freeman, to pay any sums of money whatever to Samuelson." Certificate number 8 for 7680 shares was issued to Samuelson on October 16, 1899, prior to the meeting at which the purchase from the old corporation and the issuance of bonds and stock in consideration thereof were authorized. From the stock and transfer book of the new corporation offered in evidence, there appeared opposite certificate number 8 the following statement: "This stock was subscribed for by F. W. Samuelson, issued to him subject to calls for all or any part of the full subscription at the par value thereof." Across the entry of certificate number 9, issued to Samuelson, as trustee, for the stockholders of the Hollywood Cemetery Association, is the note: "This stock is full paid and is so issued."

While the evidence in the case shows that the books of the corporation in which these entries are found were frequently examined by Samuelson, there is no direct evidence that he ever actually saw the entries, and for present purposes it' will

be assumed that he did not, and no consideration will be given to them.

It is insisted by appellants from the facts recited, that the findings of the court as to the *status* of the respective blocks of stock represented by the two certificates referred to, were wrong. This point is 'pressed with great earnestness—the stress of the argument being that it is apparent from the terms of the preliminary agreement entered into between Samuelson, and Brown, and his associates, that it was contemplated that all the stock to be issued by the corporation was to be of the same character; that if the evidence warranted the court in finding that the 12,250 shares, represented by certificate No. 9, were issued as fully paid up stock, it equally warranted a finding that the 7680 shares represented by certificate No. 8 were of the same class.

There would be much plausibility in the position of the appellants if there were nothing in the record relative to the circumstances under which the stock was ultimately issued, conflicting with their claim, or if the complaint had been framed upon the theory under which the claim is now made as to the apparent purposes of said agreement so that it could have been considered by the court.

Under the agreement itself it may well be claimed, that it was never contemplated that Brown and his associates, who were to contribute neither money nor property to the contemplated enterprise, should obtain fully paid up stock in the new corporation, and that Samuelson, who contributed valuable property, should only receive an issue of subscription stock. In other words, it would be unreasonable to say that Samuelson, who owned approximately two thirds of the stock of the old corporation, would enter into a contract whereby he was to surrender to the new corporation valuable holdings in the old one—in fact the only tangible property it secured—and receive only 7680 shares of stock in the latter corporation, upon which he was liable to the extent of seventy-six thousand eight hundred dollars for unpaid subscription,—while Brown and his associates, who were to contribute nothing tangible—should receive a large proportion of fully paid up stock, solely for abandoning a contemplated opposition enterprise and devoting their energies to the service of the new corporation, and that the fellow stockholders with Samuelson in the

old corporation should likewise receive paid up stock; that, on the contrary, a reasonable construction of the agreement was that all the stock to be issued was to be of the same class, either subscription stock or fully paid up.

In harmony with this claim, counsel for appellants now insist that this is the construction the court should have given the agreement; that it was the intention of the parties that all of the stock issued should be of the same character; that there was nothing in the evidence as far as the corporate records are concerned, indicating that the stock to be issued to Samuelson, individually, was to be of a different *status* from that issued to him as trustee for the purpose of apportioning it among Brown and his associates and the stockholders in the old corporation, and that the court should have found that the stock issued to Samuelson, individually, was the same character of stock as that issued to him as trustee, and was fully paid stock.

Whatever merit there may be in the present position of appellants, it was neither available to them in the court below, nor can it be insisted on here, for at least two sufficient reasons, the first of which is that their complaint was not framed on the theory they now advance, and, secondly, because it was in fact framed on the theory that the 7680 shares of stock were not, in fact, issued to Samuelson as fully paid stock.

If their complaint had been framed on the theory that under the preliminary agreement it was the intention and understanding of the parties that all the stock of the new corporation was to be issued as fully paid shares, in the respective proportions agreed. to, notwithstanding that upon the face of the corporate records this appeared not to have been done as far as the 7680 shares was concerned, their contention would not be without merit. It might then have been insisted that under all the evidence—the agreement and the corporate records—that it was obviously the intention of the parties that all the stock of the new corporation was to be issued as fully paid up shares, and that the actual purpose of the resolution authorizing the issuance of fully paid up stock to Samuelson as trustee was simply to have it appear upon the records of the corporation that the 12,250 shares of stock, proportional amounts of which were to be delivered to Brown

and his associates, who had really contributed no tangible property to the corporation, were, in fact, issued for property of the old corporation which was actually received by the new one. Under such a theory, if presented in the complaint, the plausible claim which is now made here might have been insisted on, although, even under the evidence as it stands, the finding as the court has made it, that these 7680 shares were issued to Samuelson—not as fully paid up but as subscription stock—would not have been unjustified. The court might well have found—and doubtless did—that while the preliminary agreement called for the issuance of stock in certain proportions, and in all probability it was understood that all stock should be of the same class, that this preliminary agreement was not the one which the parties ultimately proceeded under. None of its terms seem to have been filled. As to the proportionate distribution of stock called for in it, it appears that the 9390 shares distributed by Samuelson to Brown and his associates was something in excess of forty-five per cent of the capital stock, and that Samuelson and the other stockholders in the old company received less than fifty-five per cent of it. Then, as to the matter of bonds, nothing was said in the agreement as to them. In the forty-thousand-dollar issue thereof, Samuelson had, on account of his corporate holdings in the old corporation, an interest to the extent of probably two thirds. It will be thus observed that in the final adjustment between the parties, there was an entire departure from the terms of the preliminary agreement as to the percentage of distribution of stock and its character, and an additional element as to bonds incorporated into it.

Samuelson was not a witness on the trial, and the only witness speaking clearly on all the transactions, from the making of the preliminary agreement up to the passage of the resolution authorizing the issue of the 12;250 shares of paid up stock and the bonds, was Brown. Samuelson was a director of the corporation and acted in all the transactions (save as to the resolution authorizing the purchase of the property of the old corporation for the bonds and 12,250 shares of paid up stock, when, being interested on both sides, he refrained from voting). Brown testified that at the time the resolution was passed relative to the bonds and this stock, it was understood that the 12,250 shares should be considered paid up stock;

that as to the other stock, Samuelson subscribed for it, and there was no understanding that it was to be fully paid up; there was no order of the board of directors authorizing the issuance of this 7680 shares to Samuelson; he had the stock issued to himself and did not pay a dollar for it. Whatever, too, may be said as to the preliminary agreement contemplating that the stock to be issued to Samuelson should be of the same class as the other stock, it is certain that the issuance of stock alone did not figure in the transaction between the parties as ultimately consummated. Samuelson received stock and bonds—the latter of which had no mention in the preliminary agreement. It is not to be presumed that Samuelson had any doubt of the success of the enterprise into which the new corporation was entering. The prudence of his conduct in taking subscription stock is not to be determined in the light of the subsequent unfortunate entanglement of the corporation. He doubtless then thought the project would be a success.

As every intendment must be had in favor of the findings of the trial court, it is to be assumed that the court concluded, that if it was originally contemplated that the same class of stock in the new corporation was to be issued to all parties to it, this arrangement, which was not in writing, was abandoned, and that Samuelson, in consideration of receiving his share of the bonds of the new corporation, agreed to take the 7680 shares of stock as unpaid stock, allowing the shareholders of the old company associated with him, and Brown and his associates, to take as their share of the stock, 12,250 shares, fully paid up.

Independent of this, however, the second reason we have heretofore assigned is an all-sufficient answer to the appellants' challenge relative to the *status* of these 7680 shares. It is nowhere alleged in the complaint that these shares were intended to be, or were, issued as fully paid up stock. There are numerous allegations in the complaint as to the different holdings by the plaintiffs of portions of this block of stock, but it is barren of any allegation that it was, in fact, issued to Samuelson as fully paid. In truth, the allegations, as made, negative the proposition that it was of this character. As to the *status* of all the stock of the corporation involved here— the 7680 and the 12,250 shares—the allegations as to the

CLIV Cal.—5

former are, not that it was fully paid, in fact, but that the corporation and its officers at the time these plaintiffs acquired their holdings of it, represented it to be fully paid, and set up these representations as an estoppel on the part of the corporation to assert that it was not fully paid stock. There is clearly a very essential distinction between an allegation that a corporation by reason of its conduct is estopped from denying that stock which it has issued was fully paid and an allegation that stock which it had issued had been in fact fully paid for before or at the time of its issuance. As it is not alleged in the complaint that these 7680 shares of stock were, in fact, fully paid, no issue as to that matter could arise under the pleadings. The court was not authorized to make any finding on the subject, and had it found as appellant claims it should have done, it would have been a finding outside the issues, and reversible error.

So that, aside from the considerations we have advanced in support of the finding of the court that these 7680 shares were subscription shares subscribed for by Samuelson, the appellants are not in a position to insist that this finding is erroneous, because under their theory of the evidence it shows them to have been fully paid. There was no issue on this latter point, and appellants cannot be heard to insist on a reversal on account of facts which they claim the evidence established, but upon which they did not rely by any proper pleading.

This disposes of the claim of insufficiency of the evidence to support the finding as to the 7680 shares of stock being simply subscription stock.

Now as to the 12,250 shares: It would be idle to attempt to discuss the evidence relative to the finding that these shares were fully paid. The evidence that they were is not open to any serious question. The main contention against the finding as to character of these shares is, that the evidence shows that the value of the property transferred by the old corporation to the new in consideration of the delivery of this stock and the forty thousand dollars bonds, was far less than the face value of the stock and bonds given for it.

It may be conceded that this is true. At least there was considerable evidence to this effect. The court, however, found that the transfer was acquiesced in by all the stockholders

then interested in the new corporation, and that the assets turned over to said corporation in consideration of said stock and bonds were of great value: "in the estimation and judgment of the defendant corporation and of the board of directors of the said corporation at the time of said transfer, and were equivalent in value to the full value of the said shares and of the said bonds, and were a just and adequate consideration for the issuance of said 12,250 shares of stock as fully paid stock."

These findings were all in harmony with the evidence. Every stockholder of the new corporation assented to this transaction, and the directors authorized, approved, and ratified it. Samuelson himself was one of the actors in the matter, and these plaintiffs, who have succeeded to the shares of stock, which he then held, cannot be heard to question the validity of the issue of this paid up stock for inadequacy of its price. Directors of a corporation have a right to issue stock as fully paid up, upon such terms and at such price as they see fit, and in the absence of fraud, as far as the stockholders or their assignees are concerned, the action of the directors in issuing it is final, and the action of the corporation cannot be attacked by the stockholders, or the validity of the issue assailed on the ground, merely, that the consideration was inadequate for which the corporation issued it as fully paid up. Creditors may attack the transaction—stockholders cannot. (Cook on Corporations, sec. 35; *Stein* v. *Howard,* 65 Cal. 616, [4 Pac. 662] ; *Vermont Marble Co.* v. *Declez Marble Co.,* 135 Cal. 579, [87 Am. St. Rep. 143, 67 Pac. 1057] ; *Dickerman* v. *Northern Trust Co.,* 176 U. S. 181, [20 Sup. Ct. 311].)

Neither is it of any moment as affecting this conclusion, that the fully paid stock was issued to Samuelson as trustee for the benefit of, and to be distributed to, persons who were not interested in the property which was received by the corporation, and towards the payment of which this stock was issued. The proposition advanced by appellants is, that this issue of 12,250 shares was invalid because they were distributed to the stockholders of the old company through that medium—of Samuelson as a trustee—in violation of section 309 of the Civil Code, prohibiting the distribution of the capital of a corporation prior to its dissolution. But we cannot see how these appellants are entitled to raise this point.

They are not stockholders of the old corporation whose capital stock they say was distributed through the method they complain of. It is difficult to see how they are in a position to object or question the transaction. They do not claim that this issue might not be validly made to Samuelson, but that its issue for the purpose of distributing it partly to Brown and his associates made it invalid. But this appears to us to be a matter in which these appellants have no concern. Whether Samuelson kept the shares or turned them over, among others, to Brown, Freeman, and Entler, was a matter entirely between these parties themselves, which did not concern either the new corporation or its stockholders. It is not claimed that the new corporation distributed any of its capital thereby, and the old corporation is not complaining and is not a party to this action. If the old corporation or its stockholders have any ground of complaint, these appellants, as stockholders in the new corporation, are not authorized to make it for them. Nor, examining the particular medium through which the shares were ordered transferred to the old company, their validity was not affected by the mode adopted. It is of no consequence that the 12,250 shares were ordered to be issued to Samuelson as trustee, instead of directly to the old corporation. It is true that these 12,250 shares constituted part of the capital of the old corporation, and it is equally true that under the law of this state neither the directors of a corporation, nor its stockholders have any right to distribute the corporate capital, or the property received in exchange for it, among the stockholders. (Civ. Code, sec. 309; *Martin* v. *Zellerbach,* 38 Cal. 300, [99 Am. Dec. 365]; *Kohl* v. *Lilienthal,* 81 Cal. 378, [20 Pac. 401, 22 Pac. 689]; *Schaake* v. *Eagle etc. Can Co.,* 135 Cal. 474, [63 Pac. 1025, 67 Pac. 759].)

But we do not see how this claim of illegality in this respect could advantage appellants at all, even if their position were correct. If the issue of this stock in the manner complained of was invalid, it would result at most in rendering the issue of this 12,250 shares void. If this were the effect, the only result which would follow would be that these shares would not be liable to any assessment at all. Such a result could not aid appellants in their attack on the present assessment, because if the issue of the 12,250 shares was void, then the issue of the stock which appellants hold—which alone was assessed

—comprises the only legally issued stock of the corporation, and was therefore the only stock of the corporation liable to an assessment.

But it is said by the appellants, pursuing this same line of reasoning relative to the alleged illegal issue of these shares, that if the issue of them was illegal, then the directors of the corporation—who were such only by virtue of owning this illegal stock—had no authority to levy an assessment. We think it may be fairly concluded from the evidence, that all the directors save Brown were owners of stock subscribed for in the articles of incorporation, which were not part of these 12,250 shares. But this is really of no moment. If they were not stockholders by virtue of the fact that this issue of stock was invalid, and hence were not *de jure* directors, they were at least *de facto* directors, and that is sufficient for present purposes. As such directors they had ample power to levy the assessment, and their right to do so cannot be collaterally questioned or attacked.

There is nothing in the point that this assessment was invalid because it was not levied on all the capital stock of the corporation—that is, that it was not uniform. Section 332 of the Civil Code, provides that an assessment may be for the full amount unpaid upon the capital stock to meet liabilities, or to satisfy claims of creditors. Under this section it is proper where part of the stock of a corporation has been fully paid, or partially paid, to levy an assessment for the unpaid portion of the subscription price upon those other shares of the capital stock upon which a less amount or nothing has been paid, in order to equalize the subscription payment on all the stock. To take the case at bar as an illustration: Of the capital stock of the corporation 12,250 shares had been fully paid up, and 7750 shares had not been so fully paid. Hence the whole capital stock had not been paid. The shares stood in a different class. As to one, full payment had been made—as to the other, but a partial payment—the ten per cent assessment levied in March, 1904. Under the section cited the directors had a right to levy an assessment upon the 7750 shares as a distinctive class of corporate stock, for the whole or a part of the subscription price unpaid. This was uniformity of assessment. It would not be proper to levy an assessment to call in a given amount on a portion

of the unpaid stock, and a less amount on another, if all the stock stood in the same class as to the unpaid subscription price. A call cannot be made which will affect only a portion of those who stand in the same class as to the amount of unpaid subscription, but if upon a portion of the stock all or half should have been paid, and nothing or but a small amount had been paid on the other portion, an assessment could be properly levied on the stock which had made the smaller payments, in order to equalize the contributions of all the stockholders. This is the only mode of assessment as to different classes of stock which would not be violative of the rule that all assessments on stocks must be uniform. That assessment is the proper method to collect unpaid subscriptions is well settled. (*Kohler* v. *Agassez*, 99 Cal. 9, [33 Pac. 741]; *Union Savings Bank* v. *Dunlap*, 135 Cal. 628, [67 Pac. 1084]; *Union Savings Bank* v. *Leiter*, 145 Cal. 696, [79 Pac. 441]; 1 Cook on Corporations, sec. 114; 1 Morawetz on Corporations, 154.)

These objections of the appellants to the findings and against the validity of the issue of these 12,250 shares and the assessment, being disposed of, brings us to a consideration of the only remaining point of any consequence,—namely, how far the original character of the 7680 shares were subsequently affected by representations or conduct on the part of the corporation or by mesne transfers from the holder thereof to the present holders, these plaintiffs.

It is insisted in that regard that prior to the purchase of this stock by appellants the corporation represented to them that said shares were fully paid up and that it is now estopped to assert that the stock is of a character different from what they represented. The court, however, found that the corporation had never made such representations; that there was nothing on the records of the corporation which indicated anything other than that the shares were subscription shares and nothing had been paid thereon, and that the officers of the corporation had made no representations or statements to the contrary, and the evidence sustains these findings.

The main claim of all these appellants is, however, that they acquired these shares of stock in the open market from the holders of certificates of stock; that these certificates had been issued by the corporation defendant to the transferrers of

each of the plaintiffs and did not show that the stock represented thereby had not been paid in full; that the issuance of these certificates in this form constituted a representation by defendant corporation that the shares represented thereby were fully paid; that the plaintiffs who acquired the said certificates from the holders thereof were *bona fide* purchasers, without notice that the stock had not been paid, and, therefore, as between themselves and the corporation these shares held by plaintiffs must be deemed fully paid.

There is nothing in the particular point made, that the issuance of the certificates without it appearing thereon that the stock had not been fully paid, was a representation by the company that it had been so paid. These certificates were issued long before section 323 of the Civil Code was amended as it now reads requiring certificates issued prior to the payment of the full amount due to state the amount paid. Nor was there anything on the face of these certificates indicating whether the shares were fully paid or not. The certificate to Samuelson was of the ordinary form, reciting that he was the owner of 7680 shares, transferable on the books of the company by indorsement and surrender of the certificate. There was nothing indicating what Samuelson had paid for the shares. The corporation had a right to issue its shares for cash or upon credit and was not required to have the certificate show full or any payment, or the terms on which it was issued, and plaintiffs had no right to assume anything as to the payment. Under these circumstances no estoppel by representation could be invoked against the corporation. (*Stockton etc. Works* v. *Houser,* 109 Cal. 1, 9, [41 Pac. 809].)

But independent of this claim of representation, the broad proposition of appellants is that because they purchased their certificates of stock in good faith and without notice in the open market, such stock is to be deemed fully paid up, and they are protected as *bona fide* purchasers, even though upon the face of the certificates there was nothing to indicate that the stock had been fully paid.

In effect, their claim is, that certificates of stock are negotiable securities and subject to the same rules governing the transfer of such instruments. But this position under the law of this state is untenable. Whatever the rule may be in other jurisdictions (and some authorities therefrom are cited

by appellants in support of their claim), it is well established in this state that certificates of stock are not negotiable instruments, either in the commercial sense or within the definition of the Civil Code, and that the stock represented by them is subject to assessment for subscription calls, no matter to whom it may be transferred. The rule in this state is that certificates of stock in a corporation are but mere evidences of the holder's right to a given share in the franchises and property of the corporation and are not negotiable instruments. (*Barstow* v. *Savage M. Co.*, 64 Cal. 388, [49 Am. Rep. 705, 1 Pac. 349]; *Graves* v. *Mono Lake Min. Co.*, 81 Cal. 304, [22 Pac. 665]; *Craig* v. *Hesperia L. and W. Co.*, 113 Cal. 7, [54 Am. St. Rep. 316, 45 Pac. 10].)

Such certificates of shares not being negotiable instruments, the rule analogous to other non-negotiable instruments applies, and a purchaser takes them subject to all equities in favor of the corporation. The transfer relieves him from no liability to the corporation which his transferrer was under, so that when one purchases stock and causes the transfer to be entered upon the books of the corporation, he thereafter holds his shares on the same conditions as did the stockholder from whom he purchased; he acquires under them all his rights and is subject to all his liabilities and obligations respecting them. (*Visalia etc. R. Co.* v. *Hyde*, 110 Cal. 632, [52 Am. St. Rep. 136, 43 Pac. 10]; *Craig* v. *Hesperia L. and W. Co.*, 113 Cal. 7, [54 Am. St. Rep. 316, 45 Pac. 10]; *People's Home Savings Bank* v. *Rickard*, 139 Cal. 285, [73 Pac. 858].) Many authorities from other states might be cited to the same effect, but these from our own state declare the rule here.

The plaintiff O'Dea purchased 1386 shares of the stock in question at a sale by the corporation of the same for a delinquent assessment. This was part of the Samuelson stock and assessed to him. O'Dea claims that this was, in effect, a purchase by him directly from the corporation of these shares as the property of the corporation and not from the stockholder who theretofore had held and owned them. There is nothing in this point. When a corporation offers stock for sale to pay a delinquent assessment it acts as the agent of the delinquent stockholder. It could only acquire title in default of bidders and by bidding it in itself. When the stock is offered for sale and is purchased thereat, the purchaser takes

the title that the delinquent stockholder had and no other, and he takes it subject to liability for the unpaid subscription price. (1 Cook on Stockholders, sec. 133; Purdy's Beach on Corporations, sec. 377b.)

Some other points are made by appellants for reversal, but in our judgment they are untenable and without sufficient merit to warrant special consideration.

The judgment is affirmed.

Henshaw, J., Sloss, J., and Angellotti, J., concurred.

SHAW, J., dissenting.—I dissent. The evidence shows that Samuelson, at the beginning of his cemetery enterprise was. the owner of all the land now belonging to the new corporation, apparently free of all encumbrances, and that through the manipulations of the other parties concerned in the enterprise with him, and without the expenditure of any substantial sum of money or the contribution of any considerable effort or property by any other person, at the close of the proceedings, Samuelson stood as a subscriber for something over 7600 shares of stock in the new corporation upon which subscription he owed the new corporation the full par value of seventy-six thousand dollars, and that he was not the owner of any other property, while the other parties who contributed nothing and did nothing substantial, were the owners of all the residue of the stock in the new corporation as full paid stock on which they owed the corporation nothing, their stock being about two thirds of the total capital stock of the new corporation. It also appears, that the new corporation was then the owner of the Samuelson land and of the entire capital stock of the old corporation and by reason of such ownership of said stock was entitled to the entire beneficial interest in the forty thousand dollars of bonds which the new corporation had issued to the old corporation. In short, Samuelson went in with property in his own right of the value of something like fifty thousand dollars and came out with no property and owing seventy-six thousand dollars, and all of this was brought about by mere manipulation of documents and papers without anything of value having passed to him. Such a thing is to me absolutely incredible and some other explanation of the transactions must be possible. I think it is found in the proposi-

tion that when, after the issue of practically all the stock of the new corporation to Samuelson, the 7600 shares represented by certificate 8 and the 12,250 shares represented by certificate number 9, and when he thereupon made the distribution of the stock in accordance with the agreement, it was fully understood by all concerned that all the stock was to be considered as full paid, as in fact it was by virtue of the original agreement.   While there may be some evidence of a somewhat evasive character that is contrary to this conclusion, there is really no substantial evidence against it.

Rehearing denied.

Beatty, C. J., dissented from the order denying a rehearing, and filed the following opinion on the thirteenth day of August, 1908:—

BEATTY, C. J., dissenting.—I dissent from the order denying a rehearing of this cause.  In my opinion the whole merits of the case are bound up in the question whether it is true, as found by the trial court, that the assets of the old corporation which were transferred to the new corporation in exchange for forty thousand dollars in bonds and 12,250 shares of its stock, were, in fact, or in the honest judgment and estimation of the parties to that transaction, equal in value to the bonds ($40,000) and the par value of the shares ($122,500).  If they were of that value, or honestly believed to be of that value, it is not only lawful, but strictly just, to assess the remaining 7750 shares of subscription stock exclusively until they have contributed to the capital of the company as much per share as the 12,250 shares have contributed, viz.: ten dollars a share.  In the opinion of the court it is said that the finding on this point is sustained by the evidence. I dissent from that view.  I cannot discover in the record any substantial evidence that the assets of the old corporation were actually worth more than forty thousand dollars— worth, in other words, any more than the value of the bonds issued to Samuelson and his associates in the old corporation. Nor do I find any evidence that in the honest judgment and estimation of any of the parties, they were worth more than fifty thousand dollars.  The statement, therefore, that the 12,250 shares issued to Samuelson in trust for himself and

his associates in the old corporation had been fully paid was a fiction. They were certainly not *fully* paid, and if anything was paid on them, either in fact or according to any reasonable estimate of the value of the assets of the old corporation, it was a very small fraction, and probably less than ten per cent of their par value.

Samuelson, however, does not appear to have been defrauded. He was himself a consenting party to the statements recorded in the books of the corporation to the effect that the 12,250 shares of stock issued to him as trustee, had been fully paid. Why he chose to turn over his portion of those shares to Brown, Freeman, and Entler is unexplained, and in the absence of any complaint from him is immaterial. Aside from the stock, he received in bonds, the full value of his interest in the assets transferred to the new corporation, and he, if a party here, would have no right to complain of the court for refusing to violate the constitution (art. XII, sec. 11) and the statute (Civ. Code, sec. 359) by treating as fully paid his 7690 subscription shares, upon which, admittedly, only a small percentage of their par value has ever been paid.

But in my opinion any *bona fide* holder to whom Samuelson's subscription shares have been transferred for value has a right to ask a court of equity to enjoin the sale of such shares to satisfy an assessment levied upon them exclusively, when it is made to appear that a large part of the so-called full paid shares remain in the hands of those who took them with full knowledge that little or nothing had in fact been paid for them. The decree of the court should have been based upon the real character of the shares which the defendants are seeking to exempt from assessment, and not upon the fictitious character which they have chosen to ascribe to them. If there are any innocent holders of these exempted shares who have paid value for them on the faith of the recorded statements that they were fully paid, they perhaps might claim the exemption, but those who took them with full knowledge of their fictitious character, or gratuitously, are in the view of equity, liable to the same assessments as the plaintiffs.