[Civ. No. 1956.    Third Appellate District.—September 5, 1919.]

## COMMERCIAL SECURITY COMPANY (a Corporation), Appellant, v. MODESTO DRUG COMPANY (a Corporation), Respondent.

[1] CORPORATIONS—INSTRUMENTALITY OF INDIVIDUAL FOR TRANSACTION OF BUSINESS—LIABILITY OF EACH FOR ACT OF OTHER.—Where it appears that a corporation is but the instrumentality through which an individual for convenience transacts a particular business, not only equity, looking through form to substance, but the law itself, will hold such corporation bound as the owner of the corporation might be bound, or conversely, hold the owner bound by acts which bound his corporation.

[2] ID.—CREATION OF OBLIGATION BY AGENT — FAILURE TO COMPLY WITH BY-LAW—LIABILITY OF CORPORATION.—Where an obligation is created by the duly authorized agent of a corporation for such corporation, where most if not all of its capital stock is held and owned by one person, and the obligation is one the making of which is within the corporate powers of the corporation, and the act of making it is, therefore, not *ultra vires*, the corporation will be held bound to and liable for the proper execution of the terms of the obligation, notwithstanding it may be shown that the act of making the agreement was not in strict accord with the adopted rules or the by-laws of the corporation with respect to such matters.

[3] ID.—OFFICER IN GENERAL CONTROL OF AFFAIRS — POWERS CONFERRED BY GENERAL AUTHORITY.—A corporation is an artificial person, and where it is organized for commercial purposes, its president or general manager, or whoever may be given immediate direction or control of its affairs is its agent, empowered, unless expressly restricted to the performance of certain specified acts, to do anything which naturally and ordinarily has to be done to carry out its paramount purposes; and where authority to do some particular act, which is included in the ordinary affairs of such corporation, is not specifically given to any particular officer, and the performance of which is not specifically inhibited to the person authorized to manage its affairs generally, the intention of the board of directors to confer upon the person or officer in whom is vested the immediate direction or control or management of the affairs of such corporation authority to perform such particular act will be inferred from the general authority so given.

[4] ID.—OSTENSIBLE AUTHORITY OF AGENT — RIGHTS OF THIRD PARTIES.—Where an officer of a corporation is held out to be possessed of power to perform all acts involved in its ordinary or

usual business, the law will not permit third parties to suffer from such acts of such officer by the plea of the corporation that the ostensible authority of such officer was not in fact conferred upon him.

[5] ID.—ACCEPTANCE OF BENEFITS—RATIFICATION—ESTOPPEL.—In this action on two promissory notes executed by the president and manager of the defendant corporation, the act of such corporation in accepting the benefits of the agreement entered into by such president and manager amounted to a consent to all the obligations thereof and if, therefore, there was not thereby in law a ratification of the transaction, the corporation was, by its act of accepting the benefits of the obligation, estopped from denying the binding force thereof upon it. The legal effect of either ratification or estoppel in such a case is precisely the same.

[6] NEGOTIABLE INSTRUMENTS—CONSIDERATION PRESUMED FROM WRITING — KNOWLEDGE OF INFIRMITY — WHEN INNOCENT PURCHASER PROTECTED.—A written instrument is itself presumptive evidence of a consideration, and where there is not in the possession of the purchaser of a promissory note knowledge of any infirmity in the paper on the score of consideration, or of facts, which, when followed with reasonable diligence, would lead to the discovery of such infirmity, and no fraud in the transaction resulting in the execution of the note is shown or claimed, the purchaser, if he has exchanged value for the note, will be protected as an innocent purchaser for a consideration, and so may enforce payment thereof.

[7] CORPORATIONS — SEAL NOT AFFIXED — WANT OF AUTHORITY — EVIDENCE.—The fact that the seal of the corporation was not affixed to the notes is neither conclusive evidence of a want of authority for the execution thereof for the corporation, nor a circumstance sufficient to create even a suspicion that the notes were wanting in a consideration, or that their consideration had failed at the time of their transfer to the plaintiff.

[8] ID.—EFFECT OF SEAL—PROOF OF AUTHORITY BY PAROL.—Corporations of all kinds may be bound by their contracts not under seal. The seal of a corporation itself performs no further or greater function than to import *prima facie* verity of the due execution by the corporation of written obligations. The fact that such contracts were duly authorized by the corporation may be shown by parol.

---

5. Ratification of unauthorized contract entered into by officer by acceptance and retention of benefits, note, 7 A. L. R. 1446.

7. Effect of failure to affix seal to instrument executed by corporation, note, Ann. Cas. 1915A, 1064.

[9] Negotiable Instruments—Transfer by Bill of Sale—Notice of Infirmity.—The fact that the plaintiff took a bill of sale of the notes with a guaranty from the payee that they would be paid, in lieu of the customary indorsement in such a case, does not constitute a circumstance sufficiently significant to justify a suspicion that the notes were not all that they on their face purported to be. Such may have been the uniform custom and policy of the plaintiff.

[10] Id.—When Burden of Proof on Purchaser.—It is only where fraud or illegality in the inception of a promissory note is shown that the burden is upon the purchaser of such an obligation to prove that he purchased the note before maturity, in good faith, for value, in the usual course of business.

APPEAL from a judgment of the Superior Court of Stanislaus County. L. W. Fulkerth, Judge. Reversed.

The facts are stated in the opinion of the court.

Scott Rex for Appellant.

Hawkins & Hawkins for Respondent.

HART, J.—Plaintiff, an Illinois corporation, brought the action against defendant, a California corporation, to recover judgment on two promissory notes, each for four hundred dollars, dated December 4, 1915, payable to the Partin Manufacturing Company and alleged to have been duly indorsed and delivered by the payee to plaintiff prior to maturity. Judgment was in favor of defendant, from which judgment plaintiff prosecutes this appeal.

The Modesto Drug Company was engaged in the retail drug business in the city of Modesto. The capital stock of the corporation, with the exception of one share, was owned equally by J. T. Skow and D. W. Morris. Mr. Skow was a pharmacist and was president of the defendant corporation. He was called as a witness for plaintiff and testified that he was manager of the business, discharged the general duties pertaining to the conduct of the business, bought and sold goods, and had charge of the advertising.

In the fall of 1915 Skow had some negotiations with a representative of the Partin Manufacturing Company, of Memphis, Tennessee, and, on the 4th of December, 1915, a contract in the form of a letter addressed to the Partin

Manufacturing Company was signed "Modesto Drug Co., Purchaser, by J. T. Skow," and also contained the signature of the salesman of the Partin Company. Portions of said contract are as follows:

"Please ship to us at your earliest convenience by freight f. o. b. factory the following goods as described below:

"Capital prize, 2 passenger roadster. The purchaser is to deliver to the winner in this trade campaign the winner's choice of the following automobiles: Partin-Palmer, Monroe, Chevrolet. . . .

"Second prize, one ladies bracelet watch. . . . Third prize, one three piece French Ivory toilet set." Fourth and fifth prizes were named and ten dinner-sets. Advertising matter to be furnished by the Partin Company was specified.

"(1) The undersigned purchaser warrants that his sales for the past twelve months were $20,000. On this warranty of sales, Partin Manufacturing Company hereby agrees to increase the purchaser's sales and collections not less than $12,500. in the next twelve months. Partin Mfg. Co. agrees to refund 6 cents on every dollar the purchaser falls short of the $12,500. increase and agrees to send their bond to purchaser's bank in the sum of $800. to guarantee this agreement guaranteed by some surety company or bank satis. factory to company. Partin Mfg. Co. reserves the right to increase the number of premiums, without cost to the purchaser, if in their opinion it is necessary to bring about the above guaranteed increase. Partin Mfg. Co. agrees to send a bank certificate of deposit to purchaser's bank for $400. to be held by purchaser's bank as a guaranty that Partin Mfg. Co. will deliver the automobile chosen by the winner in this campaign. Partin Mfg. Co. agrees to send a personal representative to assist in getting candidates and helping start this trade campaign."

There followed stipulations on the part of the purchaser as to the receipt of goods, making reports, etc. "The attached notes are executed and tendered in settlement of this order, and Partin Mfg. Co. is authorized to detach the same on acceptance of this order."

The notes in suit, attached to the above instrument, had been cut therefrom prior to the commencement of the action. The first note reads as follows:

"P. O. Modesto, Calif.
"December 4, 1915.

"$400.00

"Five months after date for value received we promise to pay to the order of Partin Manufacturing Company Incorporated Four Hundred Dollars ——————— Union Savings Bank, Modesto, California.

"Modesto Drug Co.
"By J. T. Skow."

(Eight cents revenue stamps attached.)

The second note was identical with the first except that it was payable six months after date.

Witness Skow testified that the representative of the Partin Company explained to him the methods by which the defendant's business was to be increased, consisting of advertising, voting contests for prizes, etc.

The court found that the defendant did not execute or deliver to the Partin Manufacturing Company the notes in question or any promissory notes; that J. T. Skow made and delivered the notes in suit, but was not authorized by the Modesto Drug Company so to do and had no power or authority to execute them; that the Modesto Drug Company never at any time ratified the execution of said notes "and is not estopped from denying the execution of said written instruments by J. T. Skow"; that the consideration for said promissory notes and the contract above referred to has failed; that the Partin Manufacturing Company did not ship at any time to the Modesto Drug Company any automobile or any of the other articles mentioned in said contract; "that the consideration for said obligation has fully failed"; that at the time plaintiff acquired said promissory notes "it had knowledge of facts sufficient to put it on guard and to require it to make inquiry as to the authority of J. T. Skow to execute said written instruments and as to the consideration given therefor."

Appellant contends that the notes were the notes of the defendant corporation; that if they were executed without authority, the execution and the delivery of the notes were ratified by defendant, and that appellant is a *bona fide* purchaser of the notes.

The by-laws of the defendant corporation were introduced in evidence. Article IV thereof provided: "The directors

shall have power . . . to incur indebtedness. . . . The terms
and amount of such indebtedness shall be entered on the
minutes of the board, and the note or obligation given for the
same, signed officially by the president and secretary, shall
be binding on the corporation. . . . The president . . . shall
sign . . . all contracts and other instruments of writing which
have been first approved by the board of directors.''

On April 7, 1916, while the advertising and voting contest
was still being carried on, Skow sold all his shares of the
capital stock of the defendant corporation to Morris, who
signed an instrument stating: ''I do hereby agree to pay all
of the outstanding bills and accounts of the Modesto Drug
Company and to save and hold harmless the said J. T. Skow
from all indebtedness now due or owing, including current
bills, notes and notes for advertising.'' Witness Skow testi-
fied that the words ''notes for advertising'' in said instrument
referred to the notes in suit.

On the same day Morris wrote the Partin Manufacturing
Company the following letter: ''I have purchased all the
interest of J. T. Skow in the Modesto Drug Company, from
which company you hold two notes. I have agreed with Mr.
Skow to pay all notes due from the corporation and he de-
sires mé to let you know of this fact, and I hereby notify
you that I will pay said notes.''

Skow testified that before he signed the notes he discussed
the matter with Morris and that the latter said: ''Well, if
you think it is a good thing, go ahead.'' Morris denied hav-
ing made this statement.

The deposition of Roland A. Crandall, president of the
plaintiff corporation, was read in evidence. He deposed that,
in the month of January, 1916, he purchased for the plain-
tiff, from the Partin Manufacturing Company, certain notes,
including those in suit, paying therefor 92.71 per cent of their
face value.

D. W. Morris, called as a witness for the defendant, testi-
fied that he and Skow owned, in an equal amount, all the
shares of the stock of the defendant, except one share, which
was in the name of a lawyer by the name of J. M. Walthall;
that Skow, who was president of defendant, was a pharma-
cist by profession and had at all times active management
of the business of the corporation, buying the goods and
making all contracts for and on behalf of the defendant;

that he (Morris) spent practically all of his time in and about the store of the defendant and acted with Skow in an advisory capacity with respect to the business. Morris denied the statement of Skow that the latter, before the making of the contract with the Partin Company, discussed with him the proposition involving said contract, but admitted that Skow did tell him of the making of said contract the next day after it was entered into and executed. He further testified that the board of directors of defendant never held a meeting for the purpose of authorizing Skow to sign the notes; that the Partin Manufacturing Company did not furnish to the winner of the contest an automobile and that he (witness) gave the winner a check for $545 in lieu thereof; that one of the prizes, an ivory set, was so inferior that witness replaced it with another set taken from the stock in the store; that some of the sets of dishes were sent to the defendant; that the certificate of deposit and bond mentioned in the contract were never furnished by the Partin Company. On cross-examination Morris testified that he thought there was some delay on the part of the Partin Company in getting the advertising scheme started, but "the matter was in his (Skow's) hands. He had signed the contract with them and I paid very little attention to it. Q. In your conversation with Mr. Skow when this subject was under discussion, did he state to you or inform you in any way of the extent of the financial obligation that the company had incurred or was supposed to have incurred—that is, the amount of it? A. Yes, sir. Q. And so you knew that there was outstanding what was or what might be a financial obligation to this Partin Manufacturing Company to the extent of eight hundred dollars? A. Yes; he told me that at the time he signed the contract. . . . Q. He did give you to understand that payment would have to be made in the course of a few months? A. I suppose he did. He told me he had the time extended. He had had the contract changed. Q. Yes; the printed contract, he gave you to understand, had been changed at his instance? A. Yes. Q. Did he state to you or inform you at that time that the obligation was evidenced in the form of a note or notes? A. He told me that he had signed the notes." Morris testified that he addressed the following letter to the Partin Manufacturing Company, at Memphis, Tenn., under date of January 12, 1916, and mailed the same

on said date: "Dear Sirs: We have not heard anything from
you regarding the starting of the contest. We wish to get
action on it as soon as possible, as some of our competitors
have heard of what we are going to do. We have a tentative
list of candidates ready for you." The said letter was
signed, "Modesto Drug Co., by D. W. Morris." The witness
said that the Partin Co. forwarded to defendant some of the
prizes they agreed to provide it with, but that in quality they
did not measure up to the agreement. He also testified that
the company had sent one of its employees (a woman) to
Modesto to assist Skow in prosecuting the contest; that that
party accompanied Skow through the country about Modesto
and assisted him in "stirring up" an enthusiastic interest
among the people in the contest; that later a man by the
name of Prindville was sent to Modesto by the Partin Com-
pany to assist in making the contest a success, but that he
remained in Modesto but a few hours. On the twenty-fifth
day of April, 1916, a letter signed "Modesto Drug Co., by
D. W. Morris," was addressed and mailed by Morris to the
Partin Company, and in that letter Morris stated that "we
have not had a word from you regarding the contest for a
long time," and further said that "Mr. Skow, who is no
longer connected with the Modesto Drug Co., and who has
been actively engaged in the conduct of the campaign, informs
us that he wrote you some three weeks ago that some action
would be necessary to put some life into the campaign. The
time is now getting short and some quick action is necessary.
. . . Expecting to hear from you at once, we are," etc. To
that letter, the Partin Company replied, by letter under date
of May 14, 1916, and after therein acknowledging receipt of
Morris' letter of April 25th and stating that "we note that
you state that Mr. Skow is no longer connected with your
firm," the letter proceeded, in part: "We would be glad to
have you send the names and addresses of your candidates
who are in the campaign and also let us know about how active
each candidate is and we will be glad to write them a special
letter. We would be glad to have you do a little personal
work with your candidates and explain to them that the close
of the campaign is drawing near and that someone must get
busy and win this car. If you think that by offering a
vacuum cleaner to the public at large—to the one estimating
the nearest correct amount of the votes cast the last month in

your campaign, would help the campaign, we will be glad to express you one of these vacuum cleaners immediately. In the meantime, we hope your campaign will show a great improvement and we would like to hear from you by return mail.''

On further cross-examination, Morris repeated that, at the time he purchased Skow's stock in the defendant, he and Skow discussed between them the notes executed and delivered to the Partin Company by the defendant or Skow. "Q. And it was in view of the existence of those two outstanding notes," counsel for the plaintiff asked Morris, "that at that time you executed and delivered to Mr. Skow those two papers which have been offered in evidence here this morning by me, marked plaintiff's exhibits 1 and 2, which your counsel showed you here? A. Yes." (The exhibits, 1 and 2, referred to were the agreement between Skow and Morris setting forth the consideration and conditions for the sale of the former's stock to the latter and the letter written by Morris to the Partin Company, after said sale, informing said company that he had assumed liability for the payment of the notes in question.)

The above statement of the testimony and of the undisputed facts, to which may be added the further statement that it appears in the evidence that the increase of sales during the time the contest was in progress amounted to about two thousand five hundred dollars, is sufficient for the purposes of the consideration and decision of the points involved in this appeal.

The learned trial judge, in deciding the case, filed a written opinion, which has been incorporated in the record here. Therein he based the decision of the controversy upon the grounds: 1. That the notes were not those of the defendant; 2. That there was a failure of consideration for the notes, and in this particular connection it is argued both in the judge's opinion and in the respondent's brief that the plaintiff, at the time of purchasing the notes, had knowledge of facts sufficient to put it upon inquiry as to the consideration.

The argument advanced in support of the proposition first above stated is that, since the notes were made and delivered by Skow without any formal action of the board of directors of the defendant authorizing the notes to be issued and delivered or the contract upon which they were made and de-

livered to be executed, the notes cannot be held to be legal obligations of the defendant.

The evidence shows—indeed, it is admitted—that, at the time the transaction constituting the basis of this litigation took place, Skow and Morris were, practically, the defendant —that is, the corporation itself. They owned all the stock but one single share, which, as is often so with so-called "close corporations," was put in the name of attorney Walthall undoubtedly for the sole working purposes of the corporation. There can be absolutely no doubt that, when making the contract and the notes in question, Skow was not acting for himself individually, except in so far as he was interested in the defendant as a stockholder, but was acting as agent of the defendant in his capacity as its president and manager. The sole purpose of the contract was, obviously, to build up or increase the volume of the business of the defendant and not to benefit a business in which he was interested other than as a stockholder in the defendant corporation. As a matter of fact, and to all practical intents and purposes, Skow and Morris were partners in the business of the defendant, although in legal contemplation they were, under the name of the defendant, a corporation. And the situation, in its legal aspect, was in no way changed by the act of Morris in purchasing the stock of Skow, except in the fact that Morris thus himself practically became the corporation. The corporation was a mere instrumentality adopted originally by Skow and Morris, and perpetuated by the latter when he became the sole owner of all the stock therein, through which they could the more conveniently transact their business. The defendant, as we have shown, received the benefits, whatever they were, flowing from the agreement in consideration of which the notes were given, and Morris was informed by Skow of the making of the agreement and of the terms thereof, according to his own testimony, the day following that upon which the agreement was made. He made no protest or objection against the agreement or the making thereof by Skow, and thus he approved and ratified the act of Skow, the president and manager of the defendant, in making the agreement. Here, then, we have a case where a party, serving in the dual capacity of president and manager of what well may be termed a "one-man" corporation, has made an agreement for and in behalf and in the name of the corporation, undoubtedly believing in good faith that in so

doing he was acting as the agent of said corporation, duly authorized to make such an agreement, and where said agreement or the act of making it has been tacitly, or by quiescence, acquiesced in by a party who, with said president and manager, owns practically all the stock of the corporation, after he has been put in possession by said manager of knowledge of the making of the agreement and of its terms and object, and where the corporation has received certain of the benefits flowing from said agreement. The question may be asked: May a corporation, whose capital stock is entirely owned, practically, by two persons, one of whom, being in the active management of the business of such corporation, has made an agreement for the benefit of the corporation and the other of whom has virtually indorsed or by conduct ratified it, refuse performance of its obligations under the agreement? Having received the benefits, or some of them, of an agreement obviously made *for it and for its benefit* (and ostensibly *by it*), with the consent and concurrence of the owners of substantially all its capital stock, will a corporation be permitted to dodge or escape liability for obligations arising upon such agreement by the plea that the contract was made without observance of the formal requisites or prerequisites prescribed by its charter or by-laws with respect to the making of contracts? The answer to these questions may be found in the principles of equity and justice applicable to such a case as we have here. Indeed, it would be deemed a hard rule or one of more than mere unsubstantial technical texture if the courts could not consistently break through it and so hold that a corporation is bound by a contract made under such circumstances as characterized the making of the contract in the present case. [1] But the books are replete with cases holding that where it appears that a corporation is but the instrumentality through which an individual for convenience transacts a particular kind of business, "not only equity, looking through form to substance, but the law itself, would hold such a corporation bound (where contracts are made under its name under circumstances similar to those here) as the owner of the corporation might be bound, or, conversely, hold the owner bound by acts which bound his corporation." (*Llewellyn Iron Works* v. *Abbott Kinney Co.,* 172 Cal. 210, 214, [155 Pac. 986], and the many cases cited therein.) It is hardly necessary to do more herein than to

refer to the Llewellyn-Abbott case and the many cases cited therein as supporting that proposition. [2] It will suffice to say that in those cases it is held that where an obligation is created by the duly authorized agent of a corporation for such corporation, where most if not all of its capital stock is held and owned by one person, and the obligation is one the making of which is within the corporate powers of the corporation, and the act of making it is, therefore, not *ultra vires,* the corporation will be held bound to and liable for the proper execution of the terms of the obligation, notwithstanding that it may be shown that the act of making the agreement was not in strict accord with the adopted rules or the by-laws of the corporation with respect to such matters. But there is another rule, applicable to all corporations and which we think has application to the present case, which is stated in *Stevens* v. *Selma Fruit Co., Inc.,* 18 Cal. App. 242, 250, [123 Pac. 212, 215], as follows:

"There is in the record before us no evidence from which it appears that any particular officer of the defendant was specifically authorized by the board of directors to execute promissory notes for and on its behalf. The very nature of commercial corporations, of which the defendant is a type, requires that the authority to transact their usual or ordinary business affairs shall be vested in some one or more persons. [3] A corporation is an artificial person, and where it is organized for commercial purposes its president or general manager or whoever may be given immediate direction or control of its affairs is its agent, empowered, unless expressly restricted to the performance of certain specified acts, to do anything which naturally and ordinarily has to be done to carry out its paramount purposes; and where authority to do some particular act, which is included in the ordinary affairs of such a corporation, is not specifically given to any particular officer, and the performance of which is not specifically inhibited to the person authorized to manage its affairs generally, the intention of the board of directors to confer upon the person or officer in whom is vested the immediate direction or control or management of the affairs of such corporation authority to perform such particular act will be inferred from the general authority so given. [4] And where, as was clearly the case here, an officer of a corporation is held out by such corporation to be possessed of power to per-

form all acts involved in its ordinary or usual business, the law will not permit third parties to suffer from such acts of such officer by the plea of the corporation that the ostensible authority of such officer was not in fact conferred upon him. (*McKiernan* v. *Lenzen*, 56 Cal. 61; *Phillips* v. *Campbell*, 43 N. Y. 271; *Seeley* v. *San Jose Independent Mill & Lumber Co.*, 59 Cal. 22, 24; *Bank of Healdsburg* v. *Bailhache*, 65 Cal. 327, 332, [4 Pac. 106]; *Jennings* v. *Bank of California*, 79 Cal. 323, 328, [12 Am. St. Rep. 145, 5 L. R. A. 233, 21 Pac. 852]; *Greig* v. *Riordan*, 99 Cal. 316, 323, [33 Pac. 913]; *Bates* v. *Coronado Beach Co.*, 109 Cal. 160, 162, [41 Pac. 855]; *Wells, Fargo & Co.* v. *Enright*, 127 Cal. 669, 672, [49 L. R. A. 647, 60 Pac. 439]; *Siebe* v. *Hendy Machine Works*, 86 Cal. 390, 392, [25 Pac. 14].)''

In *Brown* v. *Crown Gold Milling Co.*, 150 Cal. 376, 387, [89 Pac. 87], it is said: ''The majority of the board having knowledge of the facts, it was not necessary, to conclude the company defendant in favor of plaintiff, that his employment should be ratified at a regular meeting of the board. It was sufficient that the majority of the board individually were advised of the terms of the employment of plaintiff by Mr. Doe, and took no measures to disaffirm as directors that employment. (*Pixley* v. *Western Pacific R. R. Co.*, 33 Cal. 184, 186, [91 Am. Dec. 623]; *Crowley* v. *Genesee Mining Co.*, 55 Cal. 273, 275; *Gribble* v. *Columbus Brewing Co.*, 100 Cal. 69, 72, 73, [34 Pac. 527]; *Scott* v. *Superior Sunset Oil Co.*, 144 Cal. 140, [103 Am. St. Rep. 72, 77 Pac. 817].)'' (See, also, *Cyclops I. Works* v. *Chico Ice etc. Co.*, 34 Cal. App. 10, 14 et seq., [166 Pac. 821].)

In *Doerr* v. *Fandango Lumber Co.*, 31 Cal. App. 318, 325, [160 Pac. 406, 409], this court said: ''Indeed, the proposition that ratification of a contract, the making of which is unauthorized by one of the principals, may be effectuated by a recognition, however informally, of the agreement and the obligations arising by virtue thereof, is elementary. A familiar and common application of this doctrine is to be found in those cases where an agent, in making a contract for his principal, transcends the scope of his authority as such, and the principal, after the contract has been made, although not at that time legally bound by its terms, does some act recognizing the validity of the agreement—as, for instance, accepting some of the benefits or assuming some of the burdens

thereof. In such cases, quite obviously, the principal will be deemed from his acquiescence in the contract to have ratified the unauthorized act of his agent, and will be held to its terms and conditions, notwithstanding that he has not in express language or in a formal manner ratified the contract. The case here comes within the principle thus referred to. The giving of the mortgage was not an *ultra vires* act, and there is no claim that it was. If the act involved the making of an invalid contract, it was, as shown, merely because of the manner in which it was attempted to perform the act or make the contract, and, like any other contract, it is capable of being ratified by conduct or a recognition in some manner of the obligation."

Morris himself testified, as seen, that Skow was the president of the corporation and the manager of it and its business; that he (Morris) knew nothing of the drug business or of the profession of pharmacist, and that the entire management of the concern in all its aspects was in the hands of Skow, although he (Morris) was about the establishment much of the time and acted with Skow in an advisory capacity. Thus it is clear that the corporation was not only under the immediate control and management of Skow but that he was held out as such to the public, with authority to transact for the corporation all the usual and ordinary business matters coming within its purposes and objects. Certainly, it will not be denied that Skow possessed general authority to transact and carry out such business matters of the defendant as in his judgment would tend to increase the volume of the business of the corporation and thereby augment its income and profits.

[5] It is not material to inquire whether the acceptance of benefits arising from an obligation, the making of which was in excess of the authority of the party receiving and accepting such benefits, amounts to a ratification or has the effect merely of creating an estoppel whereby the acceptor will be precluded from setting up the plea of want of authority to make the obligation to relieve himself of the burden imposed upon him by the obligation. The legal effect of either ratification or estoppel in such a case is precisely the same. Our Civil Code, section 1589, declares in effect that in such case there is a ratification. But, be that as it may, if we were to be driven from the position in this case to which

the facts firmly affix us, viz., that the transaction culminating in 'the execution of the agreement and the notes concerned here represents practically the corporate act of the defendants, it being, admittedly, a transaction within the scope of its corporate powers,. we would, nevertheless, find ourselves buttressed by unimpeachable reason in holding that the act of the defendant in accepting the benefits of the agreement amounted to a consent to all the obligations thereof and if, therefore, there was not thereby in law a ratification of the transaction, the defendant is, by its act of accepting the benefits of the obligation, estopped from denying the binding force thereof upon it. In other words, an estoppel by conduct, or *in pais* by reason of the conduct of the defendant in accepting the benefits of the agreement for which the notes were given, was raised against the right of the defendant to object to the enforcement of the notes on the ground that their execution and delivery had not been duly authorized by the defendant. (*Curtin* v. *Salmon River etc. Co.*, 141 Cal. 308, 312, [99 Am. St. Rep. 75, 74 Pac. 851], and cases cited therein; and, also, *Doerr* v. *Fandango Lumber Co.*, 31 Cal. App. 318, 324 et seq., [160 Pac. 406] *supra; McQuade* v. *Enterprise Brewing Co.*, 14 Cal. App. 315, 318, [111 Pac. 927] ; *Standard Oil Co.*, v. *Slye*, 164 Cal. 435, 446, [129 Pac. 589].)

We should now pay brief attention to the conduct of Morris with respect to the transaction involved herein at and after the time he purchased the stock of Skow, and thus practically became the sole owner of the corporation. We have shown that Morris admitted that Skow told him of the fact of entering into the agreement and of the terms thereof the day following that upon which the transaction was completed, and that Morris made no objection or protest of any kind against the transaction, being evidently accustomed to defer, as to such matters, to the judgment of Skow, who was the active manager of the defendant. We now again call attention to the conditions as set forth in their agreement, upon which the sale of Skow's stock to Morris was made. In that agreement, Morris expressly assumed liability for all the outstanding debts and obligations of the defendant, including the notes in question. Not only that, but he later addressed to the Partin Company a letter in which he stated that he had purchased Skow's stock and that he had assumed liability for the payment of the notes in suit. When that letter was written

he was, as stated, the sole owner of practically all the stock of the defendant. Can it for a moment be doubted from all this that Morris expressly affirmed and confirmed, not alone for himself but for his corporation, the agreement made by Skow for the corporation and all its terms? He not only expressly recognized the agreement as a valid and legal one in all respects, but likewise assumed the obligations created thereby; and it would amount to a mere play upon words to construe the expressions contained in his letter to the Partin Company as evidencing an intention to recognize and confirm the agreement as anything other than what it purports to be, viz., the agreement of the defendant, made for and on its behalf for the sole benefit of its business.

[6] The foregoing is a sufficient reply to the contention that the notes in suit were not supported by a consideration, although, so far as the plaintiff is concerned, it would be a matter of no consequence whether there was in point of fact a consideration supporting the notes, if it purchased the notes for value without knowledge of such want of consideration at the time of such purchase. A written instrument is itself presumptive evidence of a consideration (Civ. Code, sec. 1614), and where there is not in the possession of a purchaser of a promissory note knowledge of any infirmity in the paper on the score of consideration, or of facts, which, when followed with reasonable diligence, would lead to the discovery of such infirmity, and no fraud in the transaction resulting in the execution of the note is shown or claimed, the purchaser, if he has exchanged value for the note, will be protected as an innocent purchaser for a consideration, and so may enforce payment thereof. (Civ. Code, sec. 3122; *Kunz* v. *California Trona Co.,* 169 Cal. 348, [146 Pac. 883], *Pacific Portland Cement Co.* v. *Reinecke,* 30 Cal. App. 501, [158 Pac. 1041]; *Heney* v. *Sutro,* 28 Cal. App. 698, [153 Pac. 972]; *Jones* v. *Evans,* 6 Cal. App. 88, [91 Pac. 532]; *Eames* v. *Crosier,* 101 Cal. 260, [35 Pac. 873].)

But there is really no claim made that the notes in question were not executed and delivered to the Partin Company for a sufficient consideration. It is the contention, though, and the court so found, that there was a failure of consideration and that, when the plaintiff purchased the notes it had knowledge of facts sufficient to put it upon inquiry as to the consideration and thus have had disclosed to it not only that

the consideration for the notes had failed but that the obligations were not those of the defendant corporation. The facts referred to are that the notes in question did not bear the corporate seal of the defendant, that Skow did not sign the contract by or under his official designation, and that the plaintiff, instead of taking the notes by the usual or customary indorsement in the case of the transfer of title to negotiable instruments, required a bill of sale of them, with a guaranty that they would be paid. The fact of the absence of the seal, it is contended, was sufficient to inspire in the plaintiff distrust as to the legal integrity of the obligations, and the circumstance last mentioned, it is said, negatives the theory that the plaintiff took the notes in good faith. These propositions, for reasons to be given, are not important to the decision of this case, but they are vigorously pressed, and we will briefly notice them.

[7]    We attach no significance to the fact that to the notes the seal of the defendant was not affixed. The fact is neither conclusive evidence of a want of authority for the execution of the notes for the corporation, nor a circumstance sufficient to create even a suspicion that the notes were wanting in a consideration or that their consideration had failed at the time of their transfer to the plaintiff.

[8]    It is now the rule, generally, if not universally, recognized and followed throughout the American states as well as in England, that corporations of all kinds may be bound by their contracts, not under their seals. The rule in former times was (as the cases show) that a corporation could not express its will, or enter into a contract, except through an instrument under seal, executed by a duly constituted agent. (Thompson on Corporations, 2d ed., sec. 1920.) The modern and by far the more sensible rule is, however, that the seal of a corporation itself performs no further or greater function than to impart *prima facie* verity of the due execution by the corporation of written obligations—that is, it merely stands as *prima facie* evidence that the contracts made by corporations were executed by their authority—and no longer is a seal held to be indispensable to the execution of valid contracts by corporations. It is a matter of common knowledge that many contracts made by corporations and unattested by their seals are enforced. The books are full of such cases. The fact that such a contract was duly authorized by a corporation

may be shown by parol. There is, therefore, nothing in the fact that a contract purporting to be that of a corporation is not authenticated or attested by its seal which would necessarily justify even a suspicion that it was not executed by authority of the corporation. [9] Nor, in our opinion, does the fact that the plaintiff took a bill of sale of the notes with a guaranty from the Partin Company that they would be paid, in lieu of the customary indorsement in such a case, constitute a circumstance sufficiently significant to justify a suspicion that the notes were not all that they on their face purported to be. We, therefore, do not concur in the view of the trial judge that that fact negatives the theory that the plaintiff took the notes "in due course of business before maturity for value and without notice." The plaintiff, it appears, is in the business of buying negotiable paper, and it may be that it is its uniform custom and policy to require a bill of sale of notes purchased by it with a guaranty that the obligations are valid and will be paid. Indeed, one might acquire the ownership of such obligations without knowledge of whether the makers thereof were solvent and able to meet them, and in such case it would only be good business judgment to demand a guaranty or some protection against loss in case they proved worthless obligations for any reason. We do not know what actuated the plaintiff in thus fortifying itself against loss in the transaction, but we think it clear that that circumstance itself was not such as to indicate that the plaintiff was not an innocent purchaser of the notes for value.

But, as above stated, the matter just considered we do not deem of any particular consequence, so far as the decision here is concerned. The proposition that the notes were not those of the defendant we disposed of in the outset of this discussion and nothing further need be said of it, although we may well add to what we have already said on that question that, even if the plaintiff had made an inquiry into the question of the validity of the notes the result would only have been to discover that Skow was the president and the manager of the defendant; that, acting as such, he made the agreement and the notes for defendant and for the sole benefit of its business, and that the agreement and the obligations arising thereupon against the defendant were approved by Morris, who, with Skow, owned practically the entire capital stock

of the defendant; that the defendant's business increased to some extent in volume as a result of the action of the Partin Company under the agreement. Knowledge of these facts by the plaintiff, when it bought the notes, would not, of course, have made it any the less an innocent purchaser for value.

With regard to the matter of the alleged failure of consideration, as to which it is claimed that the plaintiff, when it bought the notes, had knowledge of facts sufficient to put it upon inquiry to ascertain whether the consideration had then failed, it is to be said that there is no evidence in the record showing or tending to show that there was such failure.

The evidence, without conflict, shows that the plaintiff purchased and became the owner of the notes before their maturity, and before the contract between the defendant and the Partin Company had been completed. In other words, the plaintiff bought the notes before the purpose of the agreement was accomplished and while the steps essential to the accomplishment of that purpose were still in progress. If, then, there was a failure of consideration for the notes, it was, of course, in the failure of the Partin Company to comply with the terms of the contract between it and the defendant, and, therefore, such failure of consideration occurred, if at all, long after the plaintiff became the owner of the notes. The correspondence between Morris and the Partin Company, in which the former complained to the latter of its inertness in the matter of prosecuting the prize contest, took place subsequently to the time at which the plaintiff bought the notes. In brief, as above stated, the contract, in consideration of which the notes were issued, was still in process of execution on the part of the Partin Company at the time the plaintiff purchased the notes, and there was not then nor could there have been, either a total or even partial failure of consideration. Of this fact it may be that the plaintiff was aware at the time it bought the notes, but if it was without knowledge of the fact and for any reason had prosecuted an investigation to determine the legal status of the notes, it would thus have readily learned that fact and still have learned no valid reason why it should not have purchased the notes and acquired title thereto by the transfer free from any infirmity, so far as consideration was concerned.

The cases cited by respondent, of which there are many, we have examined and found to be very different from this case

as to the facts. For instance, in the case of *Burns* v. *Bauer,* 37 Cal. App. 251, [174 Pac. 346], fraud was charged, proved, and found as characterizing the very transaction eventuating in the execution and delivery of the note sued on therein; and not only was that true, but the court found upon ample evidence that the plaintiff, a lawyer, who was the assignee of the note, was familiar with facts extrinsic to the note itself which were of a most suspicious character and which, if followed up with reasonable diligence, would have disclosed that the note was procured by the corporation to which it was given through false and fraudulent representations. In fact, it was found that the attorney for the plaintiff was the secretary of the corporation in whose favor the note was executed at the time the note was procured, and it was further found that plaintiff, while making inquiry as to the ability of the maker to pay the note (and it was also found by the court that the maker was amply able to pay it), made no inquiry as to whether said note was valid. [10] And, in this connection, we may add, though we conceive it to be of no special importance in view of the views of the transaction involved herein we have expressed, that it is only where fraud or illegality in the inception of a promissory note is shown that the burden is upon the purchaser of such an obligation to prove that he purchased the note before maturity, in good faith, for value, in the usual course of business. The rule, indeed, applies to a case only where there has been an illegal consideration and not where there has been a valid consideration and it has failed. This is clearly shown by the reason upon which the rule proceeds, as it is formulated by the authorities, viz.: "The presumption is (in case of fraud or duress, etc., in the procurement of the note) that he who has been guilty will part with the note for the purpose of enabling some third party to recover upon it for his benefit; and such presumption operates against the holder, and it devolves upon him to show that he gave value for it. So where the note was given for a distinctly illegal consideration." (Parsons on Notes and Bills, 188, 189; *Graham* v. *Larimer,* 83 Cal. 173, 178, [23 Pac. 286]; *Jordan* v. *Grover,* 99 Cal. 194, 195, [33 Pac. 889]; *Bailey* v. *Bidwell,* 13 Mees. & W. 73, 32 Eng. L. & Eq. 134.)

It is, of course, clear that this case does not come within the above-considered rule. Here, as the evidence indisputably

shows, and, indeed, as is in effect conceded to be the fact, the notes involved were not procured by fraud or duress or without a valid consideration. It is also clear, as we have pointed out, that the plaintiff acquired ownership of the notes for value before their maturity and before there could have been a failure of the consideration for which they were given.

We conclude, upon the record before us, that to deny the right of plaintiff to recover upon these notes would mean a failure of justice.

The judgment is, therefore, reversed and the cause remanded.

Chipman, P. J., and Burnett, J., concurred.