[Civ. No. 6271.   Second Appellate District, Division Two.—January 20, 1930.]

SAMUEL KRESS, Respondent, v. TOOKER–JORDAN CORPORATION (a Corporation), Appellant.

Merriam, Rinehart & Merriam for Appellant.

G. R. Dexter and Howard B. Henshey for Respondent.

BURNELL, J., *pro tem.*—This appeal is from a judgment decreeing the plaintiff to be the owner of 300 shares of the capital stock of the appellant corporation and ordering the latter to issue the same to him free of all claims of the corporation or any other person.

The facts as found by the court may be thus summarized: Prior to August 2, 1922, one Boadway, "who was then an officer and actively in charge of the management of defendant corporation" (then known as "Boadway Bros."), solicited a loan for and on behalf of the corporation from the Central Commercial Savings Bank (hereinafter referred to as "the bank") and was informed by the officers thereof that the bank was unable to make a single loan of the size required. It was thereupon arranged between Boadway, acting for the corporation, and the bank, that a loan of $8,500 would be made to each of three of the employees of the corporation, namely, Feeny, Ormsby and Smith, conditioned on each of them executing his note for $8,500 to be secured by a collateral deposit with the bank of 100 shares of the common stock of the corporation, and that as additional security Boadway was to indorse each of the three notes. August 2, 1922, the corporation issued to each of these employees 100 shares of its common stock of a par value of $100 per share; the bank loaned $8,500 to each of them and each of them in turn executed his note to

the bank in the amount of his loan, pledging the certificates evidencing his 100 shares of stock as security therefor, indorsing the same in blank, and Boadway indorsed the notes. Feeny, Ormsby and Smith immediately deposited with the bank the amount of their respective loans, together with additional small amounts and each drew his check for the full amount of his loan in favor of the corporation, which thus received a total of $25,000. This transaction was handled solely by Boadway, on behalf of the corporation, no one but himself having any part in the procuring of the loans or any conversation with the officers of the bank with regard thereto. He stated to the bank officers that Feeny, Ormsby and Smith were each paying to the corporation the $1500 difference between the amount loaned by the bank and the par value of the stock, and the bank had no knowledge that the stock was not being paid for in full. In fact, it believed that such was the case. None of the certificates referred to showed upon its face either that it had not been paid for in full or what amount, if any, had been paid thereon or therefor. Thereafter the three promissory notes, together with the stock so deposited as collateral security were in the regular course of business assigned and transferred to North American Bond & Mortgage Company, which upon the default of Feeny, Ormsby and Smith as to both principal and interest payments on their respective notes caused the stock to be sold at a pledgee's sale held January 9, 1924, of which notice was given in the manner provided by law and at which the plaintiff-respondent bid it in. Two days later plaintiff forwarded the certificates to the defendant corporation, together with sufficient money to cover the cost of the United States internal revenue stamps required on the transfer, with the request that the stock be transferred to him on the books and new certificates issued in his name, which request being refused was followed by a formal demand and thereafter this action was filed.

Upon certain issues tendered by the answer the court further found that the stock was regularly and duly issued by the corporation under its former name of "Boadway Bros." and that it had received a good and valuable consideration for the issuance thereof; also that it was not true that no permit had been applied for by the corpora-

tion or issued by the commissioner of corporations authorizing the issuance or sale of the 300 shares of common stock involved in the action, or that the same was void. It likewise found that the corporation did not at any time advise either the bank or its assignee that the stock had not been validly issued.

One of the points upon which appellant relies in seeking a reversal of the judgment is that the stock involved in this case and the certificates evidencing it were void because its issuance was unauthorized by any permit from the commissioner of corporations. In support of this contention appellant relies on the provision of section 12 of the Corporate Securities Act (Stats. 1917, p. 679) to the effect that "Every security issued by any company without a permit of the commissioner authorizing the same then in effect, shall be void," and upon the claim that "The record discloses that the only permit authorizing the sale of capital stock of the defendant then in force was one bearing the date of July 10, 1922, which authorized the sale of 2000 shares of *preferred stock* at par and for cash . . . " and did not authorize the sale of any common stock. The evidence to which appellant thus refers consists of certified copies of corporate permits issued to the corporation, the first bearing date February 26, 1919, and the last being dated February 5, 1923. This evidence was received under the following circumstances: A Mrs. Millard, called as a witness by the defendant corporation, testified that she was its assistant secretary and had been such for about two years (the trial was in November, 1926), prior to which she had been employed as a bookkeeper for the corporation for nine or ten years, and that its records had been in her custody for about five years. This testimony she qualified by the statement that between February of 1923 and the date when she became assistant secretary, which was some time in 1924, a lady who preceded her in that position had charge of the records, as did also, Mr. Ormsby, the secretary of the corporation, and by the further statement, "Well, my custody of the records has been that they have been in the vault for which I was responsible during all that time," and that her familiarity with the records appertained to "all the records pertaining to the bookkeeping end of it." She then testified that she was not familiar with the archives

with respect to applications for permits "except as I looked through them, but I had nothing to do with the applications" or with the custody of the records with respect thereto, that she had searched through them and that the permits which were shown to her were the only ones she had found. The court permitted the introduction into evidence of the permits over the objection that the evidence was incompetent, irrelevant and immaterial, not the best evidence and without proper foundation, with the remark, "I will let it in for what it is worth." The objection should have been sustained. There was no proof that these permits were the only ones actually issued by the commissioner of corporations. The testimony of Mrs. Millard that they were the only ones she had found falls far short of that. The commissioner of corporations could, of course, have settled the question beyond controversy by producing the records of his office showing all permits issued to the corporation, but the defendant did not see fit to avail itself of this testimony nor did it even call as its witness its own secretary, the proper custodian of its records, which omissions were in no way explained. It would seem that the presumption which arises from the production of inferior evidence "that higher evidence would be adverse" (sec. 1963, subd. 6, Code Civ. Proc.) might well be here applied.

But apart from the failure of proof to support the issue of illegality of the stock, and if it be assumed for the sake of argument only that the copies of permits found by the witness constituted all the permits issued, they show that the issuance and sale of common stock was in fact authorized. The permit of February 26, 1919, authorized the corporation "to sell and issue to L. A. Boadway 390 shares of its capital stock, and to C. E. Blackwell 50 shares of its capital stock, for the considerations heretofore received by said company; and to sell and issue to L. A. Boadway and O. E. Boadway 2200 shares of its capital stock in consideration of the transfer first to be made by them of that certain drygoods business situated in the city of San Diego mentioned in the application." The character of the stock as common or preferred is not specified on the face of the permit, but the indorsement on the reverse side thereof is "2640 shares common." The permit of December 30, 1919, authorized the sale and issuance of 500 shares of

stock, whether common, preferred or both not specified, with a similar indorsement. This last-mentioned permit, unlike the other, required the sale to be for cash and at par. The burden was, of course, upon the defendant to prove its affirmative defense that this stock was issued to its three employees without authority from the commissioner of corporations. If it was not a part of the stock covered by either of these permits but was an additional and therefore unauthorized and void issuance, that fact could easily have been established by the corporation's own books and records which the evidence showed to be in its possession. In the absence of contradictory evidence it must be presumed that the law has been obeyed (sec. 1963, subd. 33, Code Civ. Proc.) and that private transactions have been fair and regular (subd. 19). The finding "that it is not true that at no time prior to the sale and issuance of said three hundred shares of common stock had any permit been applied for or obtained by defendant corporation from the commissioner of corporations of the State of California, authorizing the sale or issuance of said . . . stock; that it is not true that the issuance of said . . . stock was or is wholly void" was, under the state of the record, fully warranted.

Appellant also attacks the finding that the issuance of the stock was "duly and regularly authorized" as being in conflict with the "uncontradicted testimony" of Boadway that its issuance "was not shown by any of the corporation's records other than the stock book itself." On this point appellant cites no authority, and it may be dismissed with the statement that the corporation cannot avail itself of the failure of its own officers or employees to make and to keep proper records of its transactions, and with the observation that the fact that the corporate seal was affixed to the certificates and that they bore the signature of its proper officers raises a presumption, sufficient unless and until overcome by other evidence, that the officers did not exceed their authority and that the certificates were issued by authority of the corporation (*Commercial Security Co.* v. *Modesto Drug Co.*, 43 Cal. App. 162, 178 [184 Pac. 964]; *Anderson* v. *Wickliffe*, 178 Cal. 120 [172 Pac. 381]; *Chandler* v. *Hart*, 161 Cal. 405 [Ann. Cas. 1913B, 1094, 119 Pac. 516]).

The remaining points attempted to be made by appellant have to do with the question of the good faith of the plaintiff, it being the contention of appellant corporation that plaintiff was not entitled to judgment ordering the corporation to transfer the stock on its books and to issue new certificates to plaintiff unless he could establish that he was a *bona fide* purchaser for value, and that the evidence did not show and the court did not in fact find that he was such *bona fide* purchaser.

Disposing first of the point as to the finding of the court, it has been repeatedly held that "the conclusion that a party is or is not a *bona fide* purchaser or holder is one of law and not of fact" (*Smith* v. *Armstrong,* 85 Cal. App. 624 [260 Pac. 347], from which the quotation is taken, and numerous cases cited therein). Consequently the omission of the trial court to expressly find on this point is immaterial, since such a finding were it made as one of fact would have to be disregarded (*Smith* v. *Armstrong, supra*).

A *bona fide* purchaser has been defined as one who can prove the possession of his grantor, the purchase of the property and the payment of the purchase money in good faith and without notice, actual or constructive (*Eversdon* v. *Mayhew,* 65 Cal. 163 [3 Pac. 641]; *James* v. *James,* 80 Cal. App. 185 [251 Pac. 666]). Appellant seeks to remove respondent from this category, not upon the theory that the North American Bond & Mortgage Company had no right to sell the pledged stock, but upon the theory that the purchaser had notice or at least means of knowledge that the persons to whom the stock had been sold and in whose names the certificates stood had not completed their payments on its purchase price, but still owed the corporation the unpaid portion thereof for which they had respectively given it their notes for $1500. Much of appellant's brief is devoted to a discussion of these matters, but in the view we take of the situation it is not material whether or not the plaintiff, who was concededly acting merely as agent for Mr. Beesemeyer, secretary of the North American Bond & Mortgage Company and an officer of the bank, knew or did not know of the indebtedness of Feeny, Ormsby and Smith to the corporation, since this indebtedness created and could create no lien on the stock but merely a personal obligation as between these three individuals and the corporation. A

case in point, although not cited in any of the briefs herein, is *Anglo-Californian Bank* v. *Grangers' Bank,* 63 Cal. 359. In that action a certificate evidencing ownership of certain stock of the defendant bank was assigned and delivered to the plaintiff bank by one Fowler, in whose name it stood, as security for the payment of a debt which he owed to such plaintiff bank. At the time of this transfer Fowler was also indebted in a large amount to the defendant bank and the latter refused to transfer the stock on its books and to issue a certificate in the name of the plaintiff bank, claiming a lien on the stock, under one of its by-laws, for the payment of this indebtedness. While the plaintiff bank had no actual knowledge of this by-law, the court noted that it might have ascertained its existence had inquiry been made, which the bank neglected to do. It was held, however, that this was not a by-law which the bank had a right to enforce, because it was in conflict with section 324 of the Civil Code providing that shares of stock ''are personal property and may be transferred by endorsement by the signature of the proprietor, or his attorney or legal representative, and delivery of the certificate.'' We quote from the opinion: ''The shares for which Fowler held a certificate were personal property, i. e., his personal property, and he could transfer it by his indorsement and the delivery of the certificate to the plaintiff or anyone else. Fowler being the holder of the certificate, was in the possession of the shares for which it was issued, and those shares were his personal property, which he was authorized by law to transfer by an indorsement and delivery of the certificate to the plaintiff. The defendant was not in possession of the shares for which Fowler held the certificate, and such shares being his personal property, the defendant had no general lien upon it for any balance which might be due it from Fowler in the course of business. (Civ. Code, sec. 3054.)''

While, as held in the case just reviewed, the law creates no lien upon stock in favor of a corporation as against a stockholder who is indebted to it and the corporation cannot make a by-law which will operate in and of itself to create such lien, the corporation and its stockholder may by mutual agreement do so, and if this is done it will be good as between them and an assignee of the stockholder will

not be protected by the rule as to *bona fide* purchasers. This is the holding in *Jennings* v. *Bank of California*, 79 Cal. 323 [12 Am. St. Rep. 145, 5 L. R. A. 233, 21 Pac. 852], in which case the stockholder had received a certificate which stated on its face that the stock evidenced thereby was transferable "only upon the books of the bank, personally or by attorney, upon surrender of the certificate, *after compliance with the conditions printed on its back.*" The condition thus referred to was as follows: "No transfer of the stock described in this certificate will be made upon the books of the bank until after the payment of all indebtedness due the bank *by the person in whose name the stock stands on the books of the bank,* except with the written consent of the president or cashier." (Italics appear in the opinion.) The court held that under the circumstances of the case an equitable lien on the stock was created by contract. We quote from the opinion: "Then was there a contract for an equitable lien? We think that such a contract must be implied from the conduct of the parties. We do not say that the mere acceptance by the stockholder of the certificate without objection would constitute a contract in the absence of subsequent dealings with reference thereto. It is not necessary to express an opinion upon such a case. But we think that the acceptance, without objection, of the certificate containing such a condition, and the subsequent borrowing of money from the bank without anything to exclude the idea that the condition was to be binding, amounts to an assent to it, so far as the particular loan was concerned, and that a contract is to be implied that the stock was to stand upon the books as security for the loan." The stockholder, one Bowman, being indebted to the bank, it was further held that his assignee had no right to enforce a demand for the transfer of the stock to himself on the books of the bank, the court saying: "The assignee of Bowman is not protected by the rule as to *bona fide* purchasers for value. Without considering the question as to the negotiability of certificates of stock, it is sufficient to say, in the first place, that as against the bank the plaintiff was not the assignee of the legal title. The code provides that the transfer by indorsement and delivery of the certificate 'is not valid, except between the parties, until the same is entered upon

the books,' etc. (Civ. Code, sec. 324.) As against the bank, therefore, the assignee took a mere equity, which must yield to the superior equity of the defendant. (*Vansands* v. *Middlesex Bank,* 26 Conn. 153; *Taylor* v. *Weston,* 77 Cal. 534 [20 Pac. 62]; *Stebbins* v. *Phenix Ins. Co.,* 3 Paige · (N. Y.), 361; *Union Bank* v. *Laird,* 2 Wheat. 393 [4 L. Ed. 269]; *McCready* v. *Rumsey,* 6 Duer (N. Y.), 582.) In the next place, the condition in the certificate was sufficient to put the plaintiff upon inquiry. The case of *Anglo-Californian Bank* v. *Grangers' Bank,* 63 Cal. 362, is not in conflict with this. There no condition was embodied in the certificate, and the by-law relied upon was not referred to therein or printed thereon.''

In the case before us there is no evidence of any agreement between Feeny, Ormsby and Smith, or either of them, and the corporation defendant that the latter should have a lien on the stock issued to them, nor did the certificates contain any language which would indicate either the existence of such agreement or that the stock was not issued as fully paid. ▆ In the absence of any lien the fact that the stockholders were indebted to the corporation could not operate to prevent them from transferring title to their stock to a third party—unless for the purpose of defrauding a creditor—any more than it could operate to prevent them from transferring any other property which they might own; although, of course, the corporation might, in an action to recover on its claim, have caused an attachment to be levied on the stock just as it might have done with respect to any other property of the debtor stockholders. In *Lankershim Ranch Land Co.* v. *Herberger,* 82 Cal. 600 [23 Pac. 134, 135], the defendant stockholder being in arrears to the corporation in payments upon the purchase price of his stock, the latter brought suit against him and caused an attachment to be levied upon his property. The trial court granted his motion to dissolve this attachment, made upon the ground ''that the payment of the obligation sued on was secured at the making by a retention of the evidences of title to such personal property, and the certificates of stock for which said obligation was created by plaintiff as security for said debt.'' Reversing the order dissolving the attachment the court said: ''In granting the motion the court

below evidently proceeded upon one of two theories: 1. That as the corporation had sold the stock to defendant, but had not issued to him a paid-up certificate of stock, it still retained the stock, and had a special seller's lien thereon for the unpaid instalments of his subscription, under section 331 of the Civil Code; or 2. That as it had not issued a certificate for full-paid stock, whether it thereby retained possession of the stock or not, it had a general lien thereon for the unpaid instalments. For if a lien existed in either case an attachment would not lie. (Code Civ. Proc., sec. 537.) A corporation for profit may give credit to the subscribers to its capital stock for the stock; and may, by proper provision in its by-laws, issue certificates to such subscribers prior to full payment for the stock. (Civ. Code, sec. 323; *Mitchell* v. *Beckman,* 64 Cal. 117 [28 Pac. 110].) The defendant in this case, therefore, upon paying the instalments due, and receiving the transferable certificate showing his subscription to and payment of all instalments due on twenty-five shares of the capital stock of plaintiff, thereby became the owner of such shares of the capital stock evidenced by such certificate, subject to the unpaid instalments mentioned in the certificate. And such certificate gave him as complete possession of the shares evidenced by it as though it were a certificate in the ordinary form issued for paid-up stock. Hence, as the plaintiff, at the time the instalment sued for became due, did not have possession of the defendant's stock, it could not have a seller's lien thereon. Did the corporation have a general lien upon the stock of defendant not dependent upon possession? We think not. Under our statutes, the only lien given to corporations for profit upon their subscribed capital stock, and which does not depend upon the possession of the certificate of stock, is to secure the payment of assessments levied for the purpose of paying expenses, conducting business, and paying debts. (Civ. Code, sec. 331.) It has been doubted, even, whether a lien upon stock can be created by a by-law, in view of section 324 of the Civil Code, which provides that shares of stock may be transferred by indorsement and delivery of the certificate, but that such transfer is not valid except between the parties thereto, until the same is properly entered upon the books of the corporation. (*Anglo-Cali-*

*fornian Bank* v. *Grangers' Bank,* 63 Cal. 359.) But however that may be, a lien not dependent upon possession of the certificate of stock may, by a contract between a corporation and its stockholders, be created in favor of the corporation, to secure the indebtedness of the stockholders to the corporation. (*Jennings* v. *Bank of California,* 79 Cal. 323 [12 Am. St. Rep. 145, 5 L. R. A. 233, 21 Pac. 852].) It is claimed by the respondent that a contract was made between himself and the corporation, whereby the latter was to retain possession of his stock and have a lien thereon for the unpaid instalments of the subscription, but the record fails to show such a contract. Our conclusion is that as no lien existed upon defendant's stock in favor of the plaintiff· to secure the instalment sued for, the court erred in granting the order dissolving the attachment, and it should therefore be reversed.''

The refusal of the corporation to transfer the stock into the name of the plaintiff on its books was absolute, and the question whether or not the plaintiff would have been liable for the unpaid balance of the purchase price if the transfer had been made is not involved here. Hence the cases of *O'Dea* v. *Hollywood Cemetery Assn.,* 154 Cal. 53 [97 Pac. 1], *Visalia & Tulare R. R. Co.* v. *Hyde,* 110 Cal. 632 [52 Am. St. Rep. 136, 43 Pac. 10] , *Perkins* v. *Cowles,* 157 Cal. 625 [137 Am. St. Rep. 158, 30 L. R. A. (N. S.) 283, 108 Pac. 711], and *Geary Street etc. R. R. Co.* v. *Bradbury Estate Co.,* 179 Cal. 46 [175 Pac. 457], upon which appellant relies are not in point. The point decided in those cases is that one who purchases stock in a corporation which has not been fully paid for by the original purchaser, and who has the same transferred to himself on the books of the corporation, is substituted for the original subscriber as a stockholder and thereafter holds the stock upon the same conditions and subject to the same obligations as the original subscriber prior to the transfer, and is therefore liable to a call or assessment for the unpaid balance due on the stock.

We do not intend by what we have said above to indicate that in our opinion it has been established that the stock in question was *not* fully paid for. On this point the record would seem to establish the contrary. The general rule is that a promissory note is but the evidence

of indebtedness and does not discharge the debt for which it was given unless by agreement of the parties. (*Western Fuel Co.* v. *Lewald Co.,* 190 Cal. 25 [210 Pac. 419]; *Ellison* v. *Henion,* 183 Cal. 171 [11 A. L. R. 444, 190 Pac. 793]); but if the agreement is that the note is to operate to discharge the original obligation and substitute a new one therefor—in other words, that it is taken in payment of the debt—then the original debt is fully satisfied by acceptance of the note, and manifestly such agreement may be inferred from the declarations and actions of the parties. (*Anglo-California Trust Co.* v. *Wallace,* 58 Cal. App. 625 [209 Pac. 78].) This is the effect of our recent decision in *Taylor* v. *King,* 102 Cal. App. 361 [282 Pac. 1017]. ■ In the instant case Mr. Boadway, who handled the entire transaction on behalf of the corporation, testified as follows: ".Q. Do you know of your own knowledge what, if anything, Mr. Ormsby paid for the stock in addition to the $8,500? A. What did they pay? Q. Yes. A. $1500 additional. Q. How was that payment evidenced? A. In the form of a note made payable to the corporation. Q. $1,500 then in the form of a note was given by each, Smith, Ormsby and Feeny? A. By each individual, yes." The books of the corporation showed that each of the three purchasers was charged with certificates evidencing 100 shares of common stock of a total par value of $10,000 and credited with a check for $8,500 and a note for $1500. Furthermore Boadway testified that he advised the officers of the bank that each of the three employees was paying the corporation the full par value of the stock. This would seem sufficiently to indicate that the corporation accepted the notes as payment of the $1500 difference between the par value of the stock and the $8,500 borrowed by each of its employees from the bank and paid over to the corporation by check. This view is further borne out by a consideration of section 323 of the Civil Code providing that "All corporations for profit must issue certificates for stock when fully paid up, signed by the president and secretary, and may provide, in their by-laws, for issuing certificates prior to full payment, under such restrictions and for such purposes as their by-laws may provide, but any certificate issued prior to full payment must show on its face what amount has been paid thereon. . . . " The

fact that the certificates in question did not show on their faces that but part payment had been made but were issued as though evidencing stock fully paid for, lends additional weight to the view that the corporation regarded the notes as given and accepted in extinguishment of the balance of the obligation.

Appellant makes the further point that the sale by the bank's assignee was not in good faith because the corporation was not notified and because the stock was bid in and sold for but $300. This point is untenable since, as we have held, the corporation had no lien or interest of ownership in the stock, and for the further reason that there is nothing to show that the price paid at the pledgee's sale was inadequate, there being no evidence in the record as to what, if anything, was the actual market value of the stock at the time of the sale.

The judgment is affirmed.

Craig, Acting P. J., and Thompson (Ira F.), J., concurred.