**KELSO v. KELSO et al.**
Civ. No. 5813.

United States District Court
W. D. Oklahoma.
July 9, 1954.

John H. Cantrell, Oklahoma City, Okl., for plaintiff.

James Rinehart, El Reno, Okl., and Charles W. Harrison, Oklahoma City, Okl., for defendants.

WALLACE, District Judge.

The plaintiff, Jerry Mae Kelso, brings this action under the Federal Declaratory Judgment Act [1] to have certain provisions of her property settlement agreement which was merged in her divorce decree construed and interpreted. The defendant, Emerson R. Kelso, plaintiff's former husband, asserts that he has

1. 28 U.S.C.A. §§ 2201, 2202.

faithfully complied with the state court decree in regard to the settlement of property rights between the parties, denies the ambiguity of any of the decree's provisions, and urges that the instant case is merely an attempt to relitigate and collaterally challenge a final state court judgment.[2]

■ As mentioned by this Court previously, in ruling upon the motion to dismiss, this Court cannot and will not retry issues considered by the state district court in connection with the suit for divorce and accompanying property settlement.[3] However, a number of issues have been raised which indicate that there exists a need for this Court to construe and interpret various provisions of the state court judgment;[4] naturally, the rights of the parties rest upon the judgment and decree and not upon the contract of property settlement inasmuch as when the contract was fully set forth in the decree it became merged in the final judgment.[5] The issues will be considered in the general order raised by the plaintiff in her pleadings.

## I.

Under The State Court Decree Is Defendant Kelso Personally Obligated To Pay Plaintiff $1000 Per Month?

The portion of the decree upon which plaintiff bases her claim of *personal* obligation on the part of Mr. Kelso provides:

"* * * as a further consideration first party Emerson R. Kelso agrees that in the future operation of the various properties above mentioned,[6] the profits and income as earned of the second party (plaintiff) will be faithfully and properly paid to her at the rate of $1,000.00 per month, and in the event her interest in said properties and businesses does not earn that amount per month, then such deficiency may be charged against her later earnings of said property to supply such deficiency."

Plaintiff asserts that this promise was given in lieu of direct alimony and that as such a personal covenant runs from Mr. Kelso to her, in addition to the obligations of the businesses based on plaintiff's ownership interests, binding Mr. Kelso to see to it that plaintiff receives $1,000 monthly.

■■ This is a very unusual provision and one which the Court considers ambiguous. Inasmuch as some force and effect must be given this provision if at all possible,[7] parol evidence was en-

2. The positions and interests of the additional defendants will be made apparent as the separate issues are discussed in this opinion.

3. "Where a party litigant has invoked the jurisdiction of a court, and the other party has voluntarily appeared and submitted thereto, it is not consonant with ordinary conceptions of justice for another court to countenance an attempt to repudiate that jurisdiction, particularly when such attempt involves considerable sums of money expended, and the unsettlement of domestic relations created under color of the judgment. (Citing cases.)" Curry v. Curry, 1935, 65 App. D.C. 47, 79 F.2d 172, 174. Also, see Anderson v. Wyoming Development Co., 1944, 60 Wyo. 417, 154 P.2d 318 wherein it was held that an action for a declaratory judgment may not be invoked to *modify* a judicial decree or judgment.

4. Cf. Whittier v. Whittier, 1946, 237 Iowa 655, 23 N.W.2d 435.

5. Finley v. Finley, 1935, 174 Okl. 457, 50 P.2d 643.

6. The mentioned properties included: (1) Kelso Department Store; (2) Kelso Clothing Company, Inc.; (3) Aircraftsmen, Inc.; (4) Century Aviation Co.; (5) Tom Avant Motors, a copartnership; (6) Bonanza Builders; and (7) Charley White Grocery, a copartnership.

7. The provision in issue must be given effect as an integral part of the entire settlement agreement and decree; and, a definite purpose must be ascribed and assigned to it. Read 15 Okl.Stat.1951 § 157; Waggoner Refining Co. v. Bell Oil & Gas Co., 1926, 117 Okl. 55, 244 P. 756; Greeson v. Greeson, 1953, 208 Okl. 457, 257 P.2d 276; Franks v. Bridgeman, 1936, 178 Okl. 557, 63 P.2d 984. Cf. McMichael v. Price, 1936, 177 Okl. 186, 58 P.2d 549, 552, wherein the court said: "* * * But the rule is that, where the terms of a contract

tertained in an effort to resolve the ambiguity and arrive at some logical interpretation.

Although a portion of the phraseology, taken alone, tends to imply that a personal obligation on the part of Mr. Kelso was established the Court has concluded that no such intent existed; and, the provision under consideration cannot be deemed to effect an independent covenant on the part of Mr. Kelso wherein he unconditionally and for an indefinite period of time indemnified the plaintiff against receiving less than $1,000 per month from the enumerated properties and businesses.[8] The phrase "in the future operation of the various properties above mentioned, the profits and income as earned of the second party (plaintiff) will be faithfully and properly paid to her" indicates that such payment is contingent upon and directly related to the profits earned by the businesses. In addition, the parol testimony establishes that such promise was further conditioned upon both parties retaining their respective interests and influences in the enterprises in question.[9]

Where there existed an undivided interest in a number of businesses such as the ones in view and where Mr. Kelso had at all times actively participated in the operation and policy making of such business interests, obviously, the plaintiff, a person with little practical knowledge of the businesses, could deem it advisable to get a commitment from Mr. Kelso wherein some assurance was given that Mr. Kelso would not use his experience and information to his own advantage to the detriment of the plaintiff. Thus, the provision in issue, although carefully hinged and dependent upon plaintiff's interest in the businesses, placed upon Mr. Kelso, so long as he was in a position of control of the various interests to see to it that plaintiff received $1,000 per month from such businesses. Such payment was conditioned not only upon Mr. Kelso's ability to induce the various businesses to make such payments but in addition was dependent upon the ability of plaintiff's interests in the over-all to support such a payment. The efficacy of the promise in question of necessity was conditioned upon the fact that both parties retain their respective interests and influences in the enterprises in question. Had the plaintiff sold her interest in *all* these properties, which she had an undisputed right to do, such action certainly would have vitiated the effect of the provisions of the decree now under consideration. Likewise, the promise by Mr. Kelso to pay the "profits and income as earned of the second party" could only be carried out by Mr. Kelso so long as he remained associated in interest with such properties and in control of same. Even though plaintiff's interest would not produce a net earning of $1,000 per month at the time of the decree, doubtless, there was some hope that such eventually might be produced. This promise gave some assurance that Mr. Kelso would with diligence attempt to produce the largest income possible for plaintiff from her interest and in addition insure the plaintiff against the holding back of dividends or profits by those persons and partners in control of

---

are susceptible of two significations, that will be adopted which gives some operation to the contract, rather than that which renders it inoperative. * * * A contract should be construed in such a way as to make the obligation imposed by its terms mutually binding upon the parties, unless such construction is wholly negatived by the language used."

8. Thus distinguish Pittsburgh, C. & St. L. R. Co. v. Keokuk & H. Bridge Co., 1894, 155 U.S. 156, 15 S.Ct. 42, 39 L.Ed. 106; Cole v. Addison, 1936, 153 Or. 688, 58

P.2d 1013, 105 A.L.R. 897; Nunlist v. Keleher, 1926, 31 N.Mex. 358, 246 P. 904, 48 A.L.R. 366.

9. The Court is more inclined to the view that this $1,000 was to be paid to plaintiff monthly so long as *all* the businesses were operating, rather than the position urged by plaintiff "so long as the businesses *or any of them* were operating". The construction called for by plaintiff would require a continuance of such payment even if plaintiff sold out all interest in these businesses but one.

the various businesses to the detriment of plaintiff.

Although there is some question as to whether Mr. Kelso had the right, without express authority, to arbitrarily allot certain sums to each of the businesses in fulfilling this $1,000 monthly requirement, such was a practical way of living up to the agreement and the Court finds no prejudice resulted to the plaintiff from such action.[10] In addition, it may easily be that such authority inheres in this provision which made it Mr. Kelso's responsibility to see that the total sum of $1,000 was paid to plaintiff out of all the businesses. There is no evidence of fraud on the part of Mr. Kelso; and, the Court believes he acted in the best of good faith in trying to meet the requirement imposed by this portion of the decree.

Plaintiff makes much of the fact that for 30 months Mr. Kelso paid her $1,000 per month (less $100 per month after liquidation of The Village Market)[11] and that such action stands out as a practical construction of this ambiguous provision demonstrating that

Mr. Kelso considered this a *personal* obligation.[12] However, inasmuch as plaintiff during this period of time received these variously allotted sums from the different businesses knowing that such businesses were in no way bound by the divorce decree other than as Mr. Kelso's interest therein appeared, such continued acceptance by plaintiff of *funds* from these different businesses can just as consistently be interpreted as impliedly recognizing that the businesses rather than Mr. Kelso were making the monthly payments and that ultimately the plaintiff's own interests in the businesses would have to stand good for such payments; and, insofar as the eventual charging of the capital accounts of plaintiff by the various enterprises to recoup for income advanced by the different properties, plaintiff in accepting these payments from the different businesses, which sums compositely totalled the amount provided for in the decree, certainly must be held to have agreed that if the businesses failed to earn profits sufficient to pay off said advances, such sums, at the end of the

10. Mr. Kelso arranged for the following businesses to pay the following amounts per month: (1) Charley White Food Market—$300; (2) Tom Avant Motor Company—$300; (3) Kelso Department Store and Kelso Clothing Company—$150; (4) Aircraftsmen, Inc., $150; and (5) Village Market—$100. Although the heaviest assignments were made to Charley White Market and Tom Avant Motor Company, the two companies least able financially to make advances on future income, plaintiff has not been prejudiced by such payments. The sums of $7,453.07 and $7,050 which have accumulated as charges against plaintiff's capital interests in the Charley White Grocery and the Tom Avant Motor Company, respectively, will result in plaintiff liquidating that amount of her interest at 100 cents on the dollar. Due to the financial collapse of these two businesses the remaining invested capital, of all partners, will be liquidated at considerably less. Significantly, the collapse of these two businesses is not attributable to any negligent or wilful mismanagement. The Charley White Grocery failed

due to the keenness of competition in the grocery business; and, the Avant Motor Company failed primarily because of the death of the managing partner, Mr. Avant.

11. Plaintiff is not contesting the accuracy of the accounting in connection with the liquidation of The Village Market, in which liquidation she received $13,300 for her share of capital investment.

12. As mentioned by the Court in its Syllabi in McDowell v. Droz, 1937, 179 Okl. 119, 64 P.2d 1210: "1. Where it becomes a question of what the agreement of the parties was, the conduct of the parties may be proven to establish the interpretation placed on the agreement by the parties themselves. The mutual interpretation of contracts affords cogent evidence of their meaning. * * * 3. If the partners have put a particular construction upon the articles or on ambiguous terms, it will be enforced by the courts, even though the result is to modify or even to cancel express stipulations." See 15 Okl.Stat.1951 §§ 160–165.

business year, would be charged to the capital accounts.[13]

## II.

### Is Plaintiff Entitled To A One-Half Interest In The Kelso Department Store Debt?

This is the single issue urged by the plaintiff which is not directly bottomed upon an express provision in the divorce decree. No reference is made to this particular debt in the property settlement agreement incorporated into the divorce decree.

Plaintiff asserts that this specific property interest was intentionally withdrawn from consideration at the time of the framing of the property settlement agreement and adoption into judgment by the state court, that she has at all times owned a one-half interest in this debt due to the fact joint funds of Mr. Kelso and plaintiff were used to make this loan to the store, and that consequently she is entitled to a court order recognizing her one-half interest. Contrarily, Mr. Kelso argues that the property settlement agreement was thorough, deliberately considered and meant to be conclusive as to the rights of the parties and that the claim in question is an attempt to go behind the divorce decree and relitigate the issues disposed of therein.

Where, as here, there is a direct conflict in testimony between persons of equal credibility it is most difficult for the Court to determine just what in fact did occur. It is true that neither res judicata nor estoppel by judgment apply to an issue not actually before the court [14] but due to the meticulous manner in which plaintiff's rights were considered and protected at the time of the divorce decree, the Court believes that this particular assertion is an effort to go behind the divorce decree and cannot be permitted. Somewhere there must be a final determination of the rights of parties, and, where, as here, the Court in rendering a divorce adopts a property settlement agreement which has carefully been considered and reconsidered by both parties to the divorce, once this decree becomes final it must rise to the dignity of a conclusive determination of all of the rights of the parties. It is difficult for this Court to believe that an item of $15,000 would be intentionally withdrawn from the consideration of the state court when all other related matters were discussed and contested in minute detail. The decree provides in part:

"and second party (plaintiff) agrees to accept the aforesaid property and income to be derived therefrom as herein set forth, as full consideration for full, final and complete settlement of all her property rights and of all of the property rights between the parties hereto and does hereby quitclaim,

13. Mr. Kelso testified: "Well, the way, the reason I agreed to this $1,000 a month, knowing that the business in all probability would not earn that, and Mrs. Kelso in her own mind knew that too, was that she wanted $1,000 a month. She kept demanding that and demanding it, and demanding that whether the business earned it or not; what she wanted was $1,000 a month, and I explained to her and the attorneys and everyone else at that time that in case the businesses did not earn $1,000 a month and she was paid $1,000 a month, the difference in the earnings which would be less than $1,000 a month would have to be charged to her capital account, and there wasn't anything else you could do, you couldn't get the money out of the air. You've got to either earn it or take it out of what you've got if you spend more than you make; you've got to spend it out of your capital." (T-99) Thus, Mr. Kelso's understanding as promisor governs the instant ambiguity. The Oklahoma Statute provides: "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." 15 Okl.Stat.1951 § 165.

14. State of Oklahoma v. State of Texas, 1920, 256 U.S. 70, 41 S.Ct. 420, 65 L.Ed. 831; Adams v. State ex rel. Mothersead, 1926, 133 Okl. 194, 271 P. 946; Magnolia Petroleum Co. v. State, 1935, 175 Okl. 11, 52 P.2d 81; 30 Am.Jur. p. 927, § 181.

release and forever surrender any claim which she might have or may hereafter have upon the real or personal property of the first party not herein agreed to be transferred or conveyed to her \* \* \*".

This provision, when construed in light of the lack of pointed reference in the decree to this $15,000 debt, establishes to the Court's satisfaction that the plaintiff's claim of interest in this debt is without merit.

### III.

Under The Decree Does Defendant Kelso Have The Authority To Pledge The Northwestern Mutual Annuity To Secure A Loan Without Conveying To The Policy Beneficiary Property Having a Minimum Value Of $21,000?

The portion of the decree pertinent to this issue states:

"It is further agreed that on June 26, 1943, Rosa A. Kelso invested in an annuity in the Northwestern Mutual Life Insurance Company for the benefit of Patricia Kelso, which annuity now has a cash value of $21,-000.00 and which policy and the cash value thereof is by the terms of such policy, controlled and owned by the first party Emerson R. Kelso, and which he desires to retain in order that he may use the same as quick assets in the operation of his several businesses, but it is agreed that in the event of such use by him, he will protect the beneficiary interest of Patricia Kelso therein to that amount by the transfer to her of other property of equal or greater value, to the end that she will at the age

15. Inasmuch as such loan has long ago been repaid the problem as to this particular past act is moot.

16. On cross-examination Mr. Kelso testified: "Q. Now you now claim that you have a right to use that (the policy) again to borrow money on without doing anything about it as long as you can make a financial statement showing a net worth in excess of $25,000? A. That's the way I understood it. \* \* \*

of 25 years have property of a value of $25,000.00"

The evidence indicates that immediately after the divorce in question, Mr. Kelso pledged the instant policy to secure a loan for the purpose of paying attorney's fees; and, at the same time failed to convey to the beneficiary "other property of equal or greater value".[15]

Although the Court does not deem this provision ambiguous and believes the proper means of enforcement of this legal obligation is by means of a contempt citation in the state court which issued the decree, Mr. Kelso, by his own testimony has intimated that he considered this requirement met by him so long as he had a net worth of $25,000 or more, and that such would serve to protect the beneficiary's interest.[16] Because of the sharp conflict in the construction of this provision by the parties the Court deems it desirable to expressly declare that in the future Mr. Kelso should not pledge this policy except the loan purpose be to "use the same as quick assets in the operation of his several businesses" and except further that the beneficiary's interest be protected by the conveyance of property to the beneficiary sufficient to protect the beneficiary against loss in the event the loan could not be repaid.

### IV.

In Establishing The Trust Called For By The Decree Did Defendant Kelso Have The Right To Reserve Powers of Management, Control And Removal Of The Trustee?

A reading of the decree provision relating to the establishment of a trust of certain realty,[17] indicates that

"Q. You didn't consider, in any event, at the time you pledged that, that you owed any obligation to Patricia whatever? A. Not until she became 25 years of age.

"Q. So that if you pledged this contract, and then go into bankruptcy for one reason or another, Patricia has no protection until she is 25? A. That might be correct." (T-204)

17. The decree reads: "First party (Mr. Kelso) agrees to establish a trust with

the underlying purpose of this provision was to permit Mr. Kelso's mother to enjoy the net rent and income so long as she lives, and Mr. Kelso to have the same right so long as he lives, with the right advancing to plaintiff should she survive the elder Mrs. Kelso and Mr. Kelso, with the fee finally coming to rest in the three Kelso children. Thus, although Mr. Kelso's mother and then Mr. Kelso are entitled to the benefits accruing from the property during their lives, Mr. Kelso along with the plaintiff were specifically restricted from alienating title to such realty.

So long as the declared purpose of the trust is carried out Mr. Kelso possesses *considerable authority in connection with* the management of these properties although he is bound by the absolute requirement that the trustee be The First National Bank and Trust Company of Oklahoma City.[18] There are no provisions in the decree which divest Mr. Kelso of all right of influence and control of said properties other than the outright prohibition against conveying title to said properties to anyone other than the designated trustee. With title vested in such trustee the practical safeguard against alienation is guaranteed. Thus, although the Court believes that Mr. Kelso was within his rights in retaining certain powers of management and control over the actions of the trustee, the Court does not believe that Mr. Kelso has the authority to remove the First National Bank and Trust Company of Oklahoma City as trustee and appoint a successor. Such an act would run contrary to the express provision establishing the trustee and place within the control of Mr. Kelso the power to alienate title to this realty.

This expression by the Court is merely a declaration of the rights of the parties arising out of the provision in the decree in question and is in no way an attempt to reform the established trust; obviously, an attempted reformation would necessitate the joining of additional parties.

## V.

### Does Aircraftsmen, Inc., Have A Lien Against Plaintiff's Shares Of Capital Stock Securing Payment Of The Advanced Dividends Paid Plaintiff?

The officers of Aircraftsmen, Inc., at the request of Mr. Kelso, made certain dividend advances to plaintiff.[19] Inasmuch as the officers of the corporation have agreed to not reduce plaintiff's capital stock interest in order to satisfy this amount, the only issue immediately before the Court as to Aircraftsmen, Inc., is whether such advances stand as a lien against plaintiff's stock. This question only becomes material should plaintiff decide to sell her stock prior to the time future dividends retire these outstanding advances.

At the time Mr. Kelso induced the corporation to advance this monthly sum to plaintiff, Mr. Kelso was neither acting as an agent for plaintiff nor as an officer for the corporation. Although the corporation was not a party to the suit between Mr. Kelso and plaintiff and could not be directly bound by the decree, when the corporation advanced these sums to the plaintiff in conformity with the decree and the plaintiff received these advances knowing that the corporation was

reference to the following described real property situated in Canadian County, State of Oklahoma, to-wit: His undivided 1/2 interest in: Northwest Quarter (NW¼) of section 28, township 13 north of range 7 West I.M., and (;) Northeast Quarter (NE¼) of section 28, township 13 north of range 7 West I.M. (Farm north of El Reno) (;) Lots three (3) and four (4) Block 95, City of El Reno, Oklahoma (Kelso Department Store Building) (;) Lots nine (9) and ten (10) Block 95, City of El Reno, Okla-

homa (Charley White Grocery Building) which property came to him by gift or descent from his father and mother and which he considers his separate property. * * *"

18. The decree specifically provides: "* * * The First National Bank and Trust Company of Oklahoma City shall be trustee * * *".

19. This was made at the rate of $150 per month. The outstanding balance is $3,441.02.

doing so under the terms and conditions set forth in the decree, such acceptance by the plaintiff gave rise to a binding agreement between the corporation and the plaintiff imposing obligations upon the plaintiff identical in character with those imposed by the decree.[20] Thus, any sums advanced could be charged against future dividends, or as ruled previously, could at the end of any business year be charged against the plaintiff's capital stock interest.

■ Although, apart from statute, charter, by-law, or custom, a mere debt on the part of a stockholder does not give rise to a lien against the stock of the debtor,[21] a lien may arise based on an independent contract between the stockholder and the corporation. Inherent in and inseparable from the understanding that plaintiff's stock ultimately would stand as security for the repayment of the advance dividends is the right of lien. Once the determination is made that the instant corporation has the authority to hold the capital stock of plaintiff liable for the debt in issue, the only effective means of enforcing this right, that is by lien, must be deemed implicit in the basic understanding between the parties.

## VI.

### Conclusion

At the time the state court decree in question was entered any fiduciary relationship which existed between defendant Kelso and the plaintiff was terminated; the only duties thereafter owed, by either party, were those specifically set forth in the final judgment.

It is the opinion of this Court that insofar as the business transaction involving Century Aviation Company, Mr. Kelso acted in good faith and was guilty of no breach of duty owed the plaintiff in ac-

cepting corporation stock for his share of commissions. Naturally, the $1,471.-17 check now in the possession of Mr. Kelso should be delivered to plaintiff.

In addition the Court further finds that the unpaid check of $1,367.53 constitutes the total amount owed plaintiff in connection with the liquidation of Bonanza Builders, Inc.[22]

Counsel should submit a journal entry which conforms with this opinion within 15 days.

---

20. Cf. 15 Okl.Stat.1951 § 75 which provides: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known, or ought to be known to the person accepting."

21. Kress v. Tooker-Jordan Corporation, 1930, 103 Cal.App. 275, 284 P. 685; Kingsbury & Co. v. Riverton-Wyoming Refining Co., 1920, 68 Colo. 581, 192 P. 503.

22. This sum represents the 35% of the liquidation dividends allotted to plaintiff in the decree.